625 So.2d 407 (1993)
Dixie S. GLADNEY, Administratrix of the Estate of Charles H. Gladney and Dixie S. Gladney, Individually and On Behalf of the Beneficiaries Under the Mississippi Wrongful Death Statute, Charlayne Lamb, Individually, Robert H. Gladney, Individually, and Estate of Charles David Sossaman, Deceased,
v.
CLARKSDALE BEVERAGE COMPANY, INC.
No. 91-CA-0106.
Supreme Court of Mississippi.
September 30, 1993.
*409 Briggs Smith, Smith Phillips Mitchell & Wilroy, Batesville, Dana J. Swan, Chapman Lewis & Swan, Clarksdale, for appellant.
Marc A. Biggers, Lonnie D. Bailey, Upshaw Williams Biggers Page & Kruger, Greenwood, for appellee.
EN BANC.
SULLIVAN, Justice, for the Court:
On November 14, 1988, Charles Gladney and David Sossaman were killed when the automobile in which they were driving collided with a beer truck owned by Clarksdale Beverage Company, Inc. The accident occurred around 8:00 a.m. at the intersection of Highway 6 and Curtis-Locke Station Road in Panola County, Mississippi, when the truck collided with the Gladney Cadillac as it apparently attempted to cross Highway 6. The facts and testimony both indicate that the area was blanketed by fog.
On January 5, 1989, the Gladney Estate and the individual beneficiaries filed a wrongful death action pursuant to Miss. Code Ann. § 11-7-13 (1972 & Supp. 1992), in the Circuit Court of the Second Judicial District of Panola County. The suit named Clarksdale Beverage Company, Inc., Davey Lee Farris, who was the driver of the Clarksdale truck, and the Estate of Charles David Sossaman as defendants. The Sossaman Estate, in its answer, counterclaimed against the Gladney Estate, contending that Sossaman was a passenger and also cross-claimed against Clarksdale Beverages.
*410 A jury trial began in October, 1990, and after three days of testimony, a verdict was returned in favor of Clarksdale Beverages on the issues of negligent driving by excessive speed and failure to keep a proper lookout. Thereafter, both the Sossaman and Gladney Estates filed motions for J.N.O.V. or in the alternative for new trial. Each charged that the jury had been improperly influenced by extraneous prejudicial evidence and argued that on the basis of Rule 606(b) of the Mississippi Rules of Evidence, evidence of such misconduct was admissible, in the form of juror affidavits accompanying the motions for J.N.O.V. or new trial, at the hearing on these motions.
Clarksdale had previously moved to strike the sworn statements of the jurors. The circuit court granted this motion and entered an order denying the plaintiffs' motions for J.N.O.V., or in the alternative, a new trial.
The Gladneys and Sossamans now appeal to this Court.

I.

SHOULD CLARKSDALE BEVERAGE'S MOTION TO STRIKE THE SWORN STATEMENTS OF TWO JURORS IN SUPPORT OF THE GLADNEY AND SOSSAMAN MOTION FOR A NEW TRIAL BE OVERRULED AND SHOULD THE SWORN AFFIDAVITS BE CONSIDERED IN DETERMINING WHETHER THERE WAS JUROR MISCONDUCT WHICH NECESSITATED A NEW TRIAL?

A.

SHOULD THE MOTION TO STRIKE HAVE BEEN OVERRULED?
The controversy in this case surrounds the trial court's refusal to allow the sworn affidavits of Juror Duane Turnage and Juror Harry Sartin, concerning alleged juror misconduct, to be admitted in support of the Gladney and Sossaman motion for new trial. Following the jury verdict and as the participants were leaving the courtroom, a juror approached an attorney for the Gladney Estate and informed him that one of the jurors had visited the accident scene and another had "run an experiment."
Mississippi Rules of Evidence Rule 606(b), which is modeled after Fed.R.Evid. 606(b), provides the key rule of law for the disposition of this issue. This rule provides that:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (Emphasis added).
Duane Turnage, an alternate juror, gave the following testimony after trial in his sworn statement at the plaintiffs' law firm:
Q. And there was some discussion made, of course, during the case about the bushes being there?
A. Right. I made the comment myself that I've been out at that intersection, and those trees along there was obstructing the view coming to the highway.
Q. Would that have been an obstruction of the view coming from the direction that the Gladney vehicle was coming from?
A. It would have been for both vehicles.
Q. Okay.
A. It 
Q. Excuse me. Go ahead.
A. Now, you can see once you get to the stop sign, you know, but if you was just approaching the highway  well, either way you wouldn't be able to see if both vehicles were moving, if they was in a certain place.
Q. All right. Is this the information you gave to the jury?

*411 A. Well, we just discussed it, you know, that I had been through that intersection, and there was trees along there.
Q. Did you try to relay it to any specific time, or was that just 
A. No. I just mentioned that I had been through that intersection and knew that those trees was an obstruction for the highway.
Q. And since you were an alternate, this would have been discussed before the jury went back to consider the verdict?
A. Right.
Andy Shackleford, a Mississippi State Highway Patrolman who responded to the accident scene at Highway 6 and Locke Station Road, testified that he measured the visibility at the scene using a highway patrol technique of counting the yellow highway lane separation markers as he drove towards the accident scene. His testimony on the visibility test was alleged to have been checked by one of the juror's visibility experiment on Highway 6.
According to Patrolman Shackleford, this method was taught to him in his law enforcement and accident reconstruction classes and takes into consideration the fact that each yellow lane marker is ten (10) feet long and is separated from its successor by another thirty (30) feet. Patrolman Shackleford testified that at the time of the accident on Highway 6, the fog limited his vision to the distance of three yellow lines or an estimated one-hundred (100) feet. While Shackleford opined that his estimation was reasonably accurate, on cross-examination, he agreed that counting stripes at sixty-five (65) miles per hour was not the best way to accurately estimate visibility.
Juror Turnage also testified that Juror Mann made several comments about the method by which Patrolman Shackleford measured visibility on the date of the accident and also about Mann's experiment to verify the visibility test. The testimony in Turnage's sworn statement is as follows:
Q. Okay. When Mr. Shackleford, Andy Shackleford, testified about seeing the lines on the highway was it the next day that Mr. Mann came back to the jury and made this statement?
A. It was either the next day or the same day. It may have been the same day when we was  No, it had to be the next day because we didn't leave there until  so it had to be the next day.
Q. And did he say that he, in essence, tried to find out if that could be done by doing it himself? Tell me again exactly how he said it as you remember it.
A. He said he tried counting the lines going 65 miles per hour, and he said he didn't see how you could determine how far you could see.
Q. And this would have been after Mr. Shackleford testified?
A. Right.
Q. And was this statement made to the jury in the jury room?
A. Yeah, we was in the jury room.
Q. Okay. And it was while you were there?
A. Right.
In addition to the sworn affidavit of Juror Turnage, a sworn affidavit of Juror Sartin was also taken by the plaintiffs' attorneys. Juror Sartin provided the following relevant testimony:
Q. If you would, tell us about any of the discussions  or, first, were there discussions about the facts of the case before the night that you really went back to deliberate there?
A. Yes, sir. I'm believing, if I can recall accurately enough, it was approximately Thursday night a gentleman made a statement that he tried counting the lines in the highway as he was coming to town, and he found it very difficult or impossible to base distance on that theory.
Q. Now, would this have been after the highway patrol officer, Andy Shackleford, testified; is that right?
A. Right.
Q. But was this before the jury went back to deliberate?
A. That was approximately a day before the jury went back to deliberate.

*412 Q. Now, what was he talking about when he was saying counting lines in the road? How did that come up in the trial?
A. Lord knows how it came up ... and I don't know what his intentions were.
Q. Now, he was, that is, the person telling about doing that experiment or whatever, counting lines, he was one of the jurors; is that correct?
A. That is correct.
Q. And the people he was telling that to were other jurors; is that correct?
A. That is correct.
Sartin also commented about the statements which Juror Turnage made relating to the intersection where the accident occurred. Sartin testified:
Q. Did you hear any other discussions by other members of the jury, whether they were regular jurors or the alternate jurors, about view of the scene?
A. I remember one gentleman (Juror Turnage) that lived close to the scene saying he never knew anything had happened there and that he had gone through the intersection. He did not state the reason he went through the intersection or whether it was for his own curiosity or whether it was for a matter of making his mind up.
Q. Was he one of the regular jurors or the alternate jurors?
A. He was one of the alternates.
Q. So that the discussion then would have been done before the jury went back to deliberate; is that right?
A. That is right.
Q. He did not go back to do the deliberations; is that right?
A. No, he did not.
Q. Now, he was talking about going through the intersection. Had he gone through the intersection, whether it was for curiosity or whatever, during the period that the trial was going on?
A. Right. Well, not the night of the deliberation. It was a night before the night of deliberation.
Q. Okay. And this statement that he made about going to the scene, was it also made to members of the jury, that is, to yourself and other members of the jury?
A. Well, it was spoken loud enough that everyone could hear it. I heard it.
In response to the Gladneys and Sossamans' Motion for New Trial, the circuit court entered an order denying the requested relief and concluded that:
Counsel for the losing plaintiffs completely ignored a long line of cases and a complete body of case law, which this trial judge will not try to recite all the cases in covering the issue of whether or not, number one, the attorneys had the right to use the procedures they used, that is bring jurors into their office in the presence of a court reporter without any notice to counsel opposite or the court for any special instructions or procedure and taking a sworn statement and then expecting this court to rely upon the sworn statements and set aside a jury verdict that was justified by the evidence in the case.
Further, each losing plaintiff attempts to look to Mississippi Rules of Evidence Rule 606(b) for authority. The defendants (sic) have simply not shown as required by Rule 606(b) that, number one, the jury was improperly exposed to extraneous prejudicial information, or number two, whether improper outside influences were exerted on a juror.
Therefore, the Court will refuse to even consider evidence from the jurors, whether in the form of affidavit or any other way. The losing plaintiffs further try to get this Court to stoop to the position of considering matters discussed in the jury room, which was secured by the losing plaintiffs, by ex parte affidavits without the knowledge to the defendants or any application to the Court for any special rules or procedures. In Mississippi jurisprudence, a new trial is only appropriate when the jury received "extra record," facts that concern a material issue in dispute and they are qualitatively different from the evidence admitted at trial. Schmiz v. Illinois Central Gulf Railroad Company, 546 So.2d 693, 696 (Miss. 1989); Salter v. Watkins, 513 So.2d 569, 571 (Miss. 1987).
*413 A short dissertation of this Court's rulings prior to and after the adoption of the Mississippi Rules of Evidence is necessary to understand the significance of the issues presently before this Court. In Sprinkle v. State, 137 Miss. 731, 742, 102 So. 844, 845 (1925), newspaper articles were brought into the jury room by two jurors which informed the jury of several matters about which testimony was not introduced at trial concerning the conspicuous character of the defendant in the court records and the fact that the defendant was also being charged for another crime. The testimony of the jurors was offered as to the misconduct of another juror. This Court stated that:
In every instance in which improper influences have been brought to bear upon the jury there will arise the fear that the accused has not had the fair and impartial trial to which he was entitled... .
Therefore jurors will not be permitted on a motion for a new trial to give evidence as to what influenced their verdict. But testimony by jurors as to the misconduct of others in their presence or hearing  testimony as to outside influences brought to bear upon them  does not fall within that principle. They will not be heard to give evidence as to their own misconduct, but they will be heard to give evidence as to the misconduct of others which is calculated to have a bearing on their verdict. They will not be permitted to testify as to the effect on their verdict of such outside influences, but they will be permitted to testify as to the fact of such influences.
Sprinkle, 137 Miss. at 744, 102 So. at 846.
In Crawley v. Illinois Central Railroad Co., 248 So.2d 774 (Miss. 1971), this Court was called upon to determine whether juror inspection of an accident scene constituted improper conduct meriting a new trial. There, the plaintiff's motion alleging that two jurors had visited the accident site to examine the railroad crossing for visibility was accompanied by the sworn affidavits of the two jurors in which each admitted their visits to the accident site. Crawley, 248 So.2d at 775. The Court expanded upon Sprinkle in noting that all of the authorities which have discussed unauthorized juror inspections of scenes involved in the case seem to differentiate between a casual visit and one made for the purpose of obtaining additional evidence for themselves and, when conveyed, as new evidence to the other jurors. Crawley, 248 So.2d at 776, 777.
We concluded that:
We are of the firm opinion that the verdict of a jury should not be subject to impeachment by testimony of the jurors; nevertheless, where jurors disobey the orders of the court to the extent of visiting the scene involved in a case, when the scene is a material factor in issue, as in this case, for the purpose of obtaining additional evidence, such conduct of jurors must be considered to be improper.
Crawley, 248 So.2d at 777.
The railroad crossing was determined to be the predominant issue in the case and this Court ordered that a new trial be granted. Crawley, 248 So.2d at 777. Yet, in discussing the merits of the case, we cited our holding in Ratliff v. Nail, 231 So.2d 798 (Miss. 1970), for a principle which is clearly applicable to the facts here. In Ratliff, a juror was offered as a witness to testify that he went to the accident scene and made observations and calculations which he later conveyed to the jury panel. Ratliff, 231 So.2d at 800. We concluded that "it has long been the law of this state that jurors cannot testify to impeach a verdict rendered by them." Crawley, 248 So.2d at 775; citing Ratliff, 231 So.2d at 800; See Index Drilling Co., Inc. v. Williams, 242 Miss. 775, 137 So.2d 525, 8 A.L.R.3d 323 (1962).
Following our holding in Ratliff, it is clear that Juror Turnage cannot testify to impeach the verdict reached by the jury. In his sworn affidavit, Juror Turnage testified that he made the comment himself to the jury that he had been out at the intersection of Highway 6 and Locke Station Road and that the trees along there obstructed the view coming onto the highway. Thereafter, he and the jury discussed the fact that he had been through the intersection and that there were trees located there. These comments are identical to those which we stated failed to constitute competent evidence by *414 which to support a motion for new trial in Ratliff. See Ratliff, 231 So.2d at 775.
Moreover, following the adoption of the Mississippi Rules of Evidence, this Court has had the opportunity to further comment upon a juror's own inspection and impressions which he relayed to the jury panel. In Schmiz v. Illinois Central Gulf Railroad Company, 546 So.2d 693, 695 (Miss. 1989), the jury foreman testified that he and a fellow juror went over the railroad crossing at issue and that he advised the other jurors of his inspection and the impression he gained from the inspection. We cited our precedent set in Sprinkle and Crawley in noting that jurors will not be heard to give evidence as to their own misconduct, but will be heard to give evidence concerning the misconduct of others calculated to be influential to the verdict. Id. at 697; See Crawley, 248 So.2d at 775; citing Sprinkle, 137 Miss. at 744, 102 So. at 846.
Following the consistent manner in which this Court has treated the issue of jurors commenting on their own observations and misconduct, this Court will not now allow such evidence to support a motion for new trial. To allow Juror Turnage's sworn affidavit concerning his own extraneous observations to the jury about the accident intersection would be in serious conflict with our own precedent. It would also be in conflict with the explicit language of M.R.E. 606(b), which states that a juror may not use an affidavit or evidence of any statement by him concerning a matter he is precluded from testifying on for any purpose outlined within the rule. The trial court did not err in striking the sworn statement of Juror Turnage concerning his own account of the inspection of the intersection because, under the law of this state, he cannot impeach his own verdict.
The representatives for the Gladney and Sossaman Estates also contend that the sworn affidavit of Juror Harry Sartin constituted sufficient evidence under M.R.E. 606(b) to warrant a hearing on the issue of whether extraneous matter reached the jury panel. While Juror Turnage is precluded from giving evidence about his own misconduct, Sartin is in no way barred from providing the same information within the bounds of M.R.E. 606(b). Clarksdale contends that Turnage's inspection of the fatal intersection was at best casual and was forgotten by him until he was adequately prompted during questioning in the course of his affidavit being taken. Yet Clarksdale's contention is not well received by this Court in light of our recent holding in Brake v. Speed, 605 So.2d 28, 37 (Miss. 1992), wherein we held that "[i]t should be readily apparent, however, that it is the nature of the information acquired and its relation to material issues in the case which controls, no matter whether the information was accidentally, casually, or deliberately acquired."
The substance of Sartin's affidavit concerning Turnage's inspection was merely that on the night before the night of deliberation, Turnage told the other jurors that he lived close to the accident scene and had gone through the intersection. The Gladney and Sossaman Estates' argue that visibility was the key issue in this case. However, Sartin's testimony does not reveal anything relating to visibility; he gave no instance in which Turnage said there were trees, or anything else, obstructing or impairing the line of sight at the intersection. In fact, his affidavit only states that Turnage lived near and had been through the intersection.
The record demonstrates that the jury had numerous photographs depicting the accident scene. In addition, Clarksdale does not dispute the fact that there were trees present at the intersection and argues that this fact was clearly made evident at trial. Therefore, Sartin's testimony that Turnage had been through the intersection is not sufficient to prove that the jury was provided with any additional information outside the record of proceedings in open court; this does not constitute an outside influence under M.R.E. 606(b). See Brake, 605 So.2d at 37.
According to Salter v. Watkins, 513 So.2d 569, 571 (Miss. 1987), a relevant inquiry for this Court in determining the merits of a new trial argument is "[w]here such extra-record facts affect an issue of importance in the case and are qualitatively different from the evidence properly before the jury, a new trial may be ordered." See United States v. Perkins, 748 F.2d 1519, 1529-34 (11th Cir.1984). *415 In sum, there were no "extra-record" facts presented to the jury through Turnage's statements concerning the intersection: one, because he cannot give evidence of his own misconduct; and, two, because even Sartin's recollection of Turnage's misconduct reveals no "extra-record" facts which are "qualitatively different" from those properly before the jury.
A more problematic issue concerns Turnage's and Sartin's sworn accounts detailing Juror Mann's statements about his experiment with Patrolman Shackleford's visibility test. The material portion of each of these juror's recollections is that both testified that Juror Mann told the other jurors that he tried counting the highway lane divider lines at sixty-five (65) miles per hour and that he did not see how anyone could determine visibility or base distance from this. Upon a cursory examination, these statements seem likely to constitute extraneous information under M.R.E. 606(b). However, in line with the preceding paragraphs of this opinion wherein we concluded that the lack of "extra-record" facts precludes a need for a new trial, Juror Mann's testimony does not provide support for a new trial.
This result is reached exclusively on the fact that Patrolman Shackleford testified at trial that the test he used to determine visibility, by counting the number of lane markers ahead of his vehicle en route to the accident scene, was not the best way to get an accurate estimate of how far one could see. Mann's testimony was at most a comment on what had already been introduced to the jury during the course of the trial procedure; Shackleford's method of determining the distance of sight was not without question as to its accuracy. Once again, we must conclude that neither Turnage's nor Sartin's sworn affidavits describing Mann's experiment amount to anything "extra-record," or "qualitatively different" from that which was properly brought to the attention of the jury during the course of trial. See Salter, 513 So.2d at 571.
This Court's authority to reverse a trial court's ruling on a motion for new trial is limited to those instances when the trial court abuses that discretion. Burnham v. Tabb, 508 So.2d 1072, 1075 (Miss. 1987); Davis v. Singing River Electric Power Association, 501 So.2d 1128, 1129 (Miss. 1987); Shelton v. Puckett, 483 So.2d 354 (Miss. 1986). Furthermore, in Salter, we concluded that even assuming arguendo that the statements involved therein did constitute specific, extra-record facts affecting an important issue, this was not so substantial to warrant our holding that the circuit court had abused its discretion in denying Salter's motion for new trial. Salter, 513 So.2d at 574. Here, we do not even entertain the argument that these juror statements could constitute extra-record facts; therefore, we justly conclude that there was no abuse of discretion on the part of the circuit court in striking the affidavits.
In the circuit judge's opinion, he stated, "[t]herefore the Court will refuse to even consider evidence from jurors, whether in the form of affidavit or any other way." If the circuit judge did refuse to consider this evidence from the jurors, then this was error. Yet, from the entirety of the circuit judge's statement wherein he found that, "the defendants have simply not shown as required by Rule 606(b) that, number one, the jury was improperly exposed to extraneous prejudicial information, or number two, whether improper outside influences were exerted on a juror," it appears that he did indeed consider the evidence from the jurors in reaching this conclusion. While the circuit judge's reasoning may have been faulty, his conclusion that the affidavits do not meet the requirements under M.R.E. 606(b) was correct, and after review by this Court, we uphold the outcome reached by the circuit court.

B.

HOW SHOULD THE ISSUE OF JUROR MISCONDUCT BE PROPERLY BROUGHT TO THE ATTENTION OF THE COURT IN WHICH IT OCCURRED AND HOW SHOULD THIS COURT BALANCE THE NEED FOR ATTORNEY INQUIRY WHEN THERE IS JUROR MISCONDUCT OR A TAINTED VERDICT AGAINST THE JURORS' RIGHTS TO BE SECURE IN THEIR VERDICT?
With the alleged extra-record, extraneous material improperly brought to influence the *416 jury now disposed of in favor of Clarksdale Beverages, this Court can now tackle the task of formulating a systematic method by which attorneys in this state can inquire into juror verdicts under the principles of M.R.E. 606(b). Unfortunately for this Court, we are without our own precedent and therefore must look to the guidelines from the federal courts which have interpreted Fed.R.Evid. 606(b) to implement a procedure by which the attorneys, litigants and courts of this state can proceed with uniformity through the issue of improper outside influence.
As an overview on this question, Wright and Gold have noted that:
In the absence of rules clearly regulating the propriety of post-verdict juror interviews, the courts have sought to exercise control. Some courts have denied permission to conduct posttrial interviews of jurors unless there is a proper preliminary showing of likely jury misconduct and witness competency. Some courts enjoin post-verdict interviews of jurors as a matter of course, lifting the injunction only after the requisite showing has been made. Other courts require counsel give the court and opposing parties notice before the interviews occur. This permits the court to supervise the interview process so as to minimize the potential for harassment. Other courts regard giving notice and seeking the court's leave to conduct interviews as merely preferred, not required, practices.
Wright & Gold, Federal Practice and Procedure: Evidence § 6076 (1990).
In United States v. Infelise, 813 F. Supp. 599 (N.D.ILL. 1993), a Federal District Court in Illinois was called on to interpret Fed. R.Evid. 606(b) in the context of whether the evidence was sufficient to warrant juror interviews regarding extraneous prejudicial information. The facts indicated that numerous jurors appeared on the local news several days after the verdict and stated that a mistake had been made with respect to Count one of the defendant's verdict form. Id. at 603. Immediately thereafter the court, sua sponte, scheduled an in-chambers status hearing in which counsel for both sides met with the court and determined that the jurors should be questioned regarding this new information, which later occurred in the judge's chambers with all attorneys involved and a court reporter present. Id. Months thereafter, another juror wrote the court and commented on the events of jury deliberation and prosecutor comments during the in-chambers interview process. Id. at 604.
The court then turned to Fed.R.Evid. 606(b) to resolve the issue, noting that the Advisory Committee Notes explained that "[t]he values sought to be promoted by [the rule] include freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." Id. Furthermore, the court asserted that there is a general reluctance to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct, or extraneous influences." Id. at 605; United States v. Moon, 718 F.2d 1210, 1234 (2d Cir.1983). "The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic evidence to overcome the presumption of jury impartiality." Infelise, 813 F. Supp. at 605; United States v. Barshov, 733 F.2d 842, 851 (11th Cir.1984). In addition, the court concluded that under Rule 606(b), a post-trial hearing is mandated only upon a litigant's showing with "clear, strong, substantial, and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred[.]" Infelise, 813 F. Supp. at 605; Moon, 718 F.2d at 1234. This same standard for review was cited by the Eleventh Circuit in Tejada v. Dugger, 941 F.2d 1551, 1561 (11th Cir.1991), and United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir.1990) [quoting United States v. Ianniello, 866 F.2d 540, 543 (2d Cir.1989)].
The court cited the Seventh Circuit, in Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir.1991), for its approval of a limited inquiry into the effect of extraneous influences upon juror verdicts, finding the appropriateness of the court's questioning to be:
Rule 606(b) of the evidence rules, far from giving a judge carte blanche in questioning a jury about its verdict, forbids him to inquire into the jurors' beliefs, opinions, discussions, grounds, etc. save as necessary *417 to determine the existence and content of any unauthorized communication made to the jury. The proper procedure therefore is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly it said, to determine  without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion  whether there is a reasonable possibility that the communication altered their verdict. Cited in Infelise, 813 F. Supp. at 611-12; See United States v. Fozo, 904 F.2d 1166, 1171 (7th Cir.1990); United States v. Schwartz, 787 F.2d 257, 261 (7th Cir.1986).
A similar holding was reached by a Texas Federal Court in United States v. Cauble, 532 F. Supp. 804, 808-809 (E.D.Texas 1982) [where the court concluded that the trial court has the inherent power and duty to supervise inquiries into alleged juror misconduct and to ensure that any inquiry does not extend beyond testimony admissible under Rule 606(b)].
In United States v. Griek, 920 F.2d 840, 841 (11th Cir.1991), the issues of juror misconduct surrounded an anonymous telephone call to a co-defendant in which the caller stated that the jury was "pressed into making our decision," and a letter from an alternate juror to the participating assistant United States attorney stating his trial performance and attire were extravagant. Griek challenged the constitutionality of an applicable local rule of the Southern District of Florida, and also Fed.R.Evid. 606(b), which permitted juror polling "after the jury had been discharged, upon application in writing and for good cause shown ... to determine whether the verdict is subject to legal challenge." Id. at 842. The court construed this local rule in light of the Federal Rules of Evidence, concluding that good cause under the local rule may be shown only by satisfying the requirements of the exception stated in Fed.R.Evid. 606(b); essentially a showing of either improper outside influence or extraneous prejudicial information. Id.
The Ninth Circuit, in Hard v. Burlington Northern Railroad, 812 F.2d 482, 485 (9th Cir.1987), stated in a footnote that when faced with allegations of jury misconduct, the better practice is for the attorney to seek leave of the court to approach the jury. See Maldonado v. Missouri Pacific Railway Co., 798 F.2d 764, 769 (5th Cir.1986).
The conclusion has also been reached by several federal courts that the trial court has the discretion to determine whether evidence of premature deliberation warrants an evidentiary hearing. See Cuthel, 903 F.2d at 1382; Bolton v. Tesoro Petroleum Corp., 871 F.2d 1266, 1275 (5th Cir.1989) ("how to best gather information regarding alleged jury misconduct is a matter of trial court discretion"); Cauble, 532 F. Supp. at 808-809.
In Big John, B.V. v. Indian Head Grain Co., 718 F.2d 143, 150 (5th Cir.1983), the Fifth Circuit reiterated its requirement that a necessary showing of "specific instances of misconduct" be made prior to allowing juror interrogation. The Fifth Circuit further explained that:
"the very cogent reasons" for requiring parties to make a showing of likely misconduct before allowing such an inquiry: protecting the jury from post-verdict misconduct and the courts from time consuming and futile proceedings; reducing the "chances and temptations" from tampering with the jury; and increasing the certainty of civil verdicts.... We continue to decline to "denigrate jury trials by afterwards ransacking the jurors in search of some ground ... for a new trial" unless some preliminary showing is made. Id. quoting Wilkerson v. Amco Corp., 703 F.2d 184, 185-186 (5th Cir. 1983).
The Second Circuit, in United States v. Moten, 582 F.2d 654 (2nd Cir.1978), discussed the relationship between Rule 606(b) and other rules which govern post-trial jury contact. The court stated as follows:
A serious danger exists that, in absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things *418 which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts. Thus, supervision is desirable not only to protect jurors from harassment but also to insure that the inquiry does not range beyond subjects on which a juror would be permitted to testify under Rule 606(b).
It is well established in this Circuit that in order to insure that jurors are protected from harassment, a district judge has the power, and sometimes the duty, to order that all post-trial investigation of jurors shall be under his supervision. Id. at 665; Miller v. United States, 403 F.2d 77, 81-82 (2d Cir.1968).
Moten also suggests that a preliminary showing of juror misconduct be made before leave is granted to interview the witnesses. Moten, 582 F.2d at 666; See also United States v. Gravely, 840 F.2d 1156, 1159 (4th Cir.1988) ("without a threshold showing of improper outside influence, defendant's request is a mere fishing expedition"); Big John, 718 F.2d at 150. In sum, the Second Circuit suggested that, at a minimum, notice to opposing counsel and the court should be given in all cases where post-verdict interviewing of jurors is sought. Moten, 582 F.2d at 665, 666. When there has been a showing which warrants investigation, barring all interviewing, even under the auspices of the court, is improper. Id.
Furthermore, in Gravely, the Fourth Circuit cited Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), applying the Supreme Court's reasoning that in the absence of a threshold showing of external influence, Fed.R.Evid. 606(b) does not require an inquiry into the juror verdict.

JUROR INQUIRY IN MISSISSIPPI
This Court has studied the procedures suggested and implemented via the Federal Court's interpretations of Fed.Rule Evid. 606(b) and has reached the conclusion that we must now adopt our own prophylactic method to uniformly execute juror inquiry, under M.R.E. 606(b), within this state.
There is no general prohibition in this state against contact with jurors after they have been discharged, yet this Court is aware that some districts in this state have local rules or practices which prevent or inhibit this contact. Brake, 605 So.2d at 36. Any local rules or procedures which inhibit or prevent juror contact are now expressly revoked. This Court will not stand for any local rule which affects juror contact; any inconsistency with the procedures implemented here shall no longer be the law of this state.
This Court notes that it is well settled law among the Federal Courts which have interpreted Fed.R.Evid. 606(b) that there is a general reluctance after verdict to haul in and probe jurors for potential instances of bias, misconduct or extraneous influences. See Infelise, 813 F. Supp. at 605; Moon, 718 F.2d at 1234. We also similarly conclude that inquiry will not be permitted as a "mere fishing expedition." See Gravely, 840 F.2d at 1159. However, contrary to the Fifth Circuit's finding in Bolton, we think it more prudent to set out the procedure for trial judges to employ in alleged juror misconduct cases. See Bolton, 871 F.2d at 1275.
As a beginning to this inquiry, the trial court and opposing counsel must be made aware of any potential juror misconduct when this evidence is manifested. Thus, if a juror approaches an attorney for one of the parties or the court itself, or if either subsequently learns such through alternative means, all parties involved should be made aware of the allegation as expeditiously as possible. However, to prevent either party from "fishing" for a way to change the undesirable conclusions rendered in their jury's verdict, a balance must be struck between the right to inquire into the jury verdict and the right of each juror to be free from harassment and secure in their verdict.
Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality. *419 Juror polling shall only be permitted by an attorney, outside the supervision of the court, upon written request.
At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information. The Eleventh and Fourth Circuits have stated the showing must express "clear, strong, substantial, and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred." See generally Tejada, 941 F.2d at 1561; Cuthel, 903 F.2d at 1382; Ianniello, 866 F.2d at 543; Infelise, 813 F. Supp. at 605. This standard is too stringent for application by this Court. Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred. The sufficiency of such evidence shall be determined by the trial court if a post-trial hearing is indeed warranted under these standards.
The trial court has the inherent power and duty to supervise these post-trial investigations to ensure that jurors are protected from harassment and to guard against inquiry into subjects beyond which a juror is competent to testify under M.R.E. 606(b). The trial court's supervision is warranted to protect the interest of the parties and jurors. Inquiry is allowable outside the presence of the trial court, upon written request and trial court permission, yet when the trial court determines that either the likelihood of juror harassment is evident or inquiry into a range of information beyond which testimony is permitted under Rule 606(b) is subject to occur, the inquiry should be interwoven with the trial judge's supervision.
In the absence of a threshold showing of external influences, an inquiry into the juror verdict is not required. When the threshold showing is made under the standards previously outlined, the court should conduct a post-trial hearing. The scope of the hearing is however, limited; the proper procedure is for the judge to limit the questions asked the jurors to determine whether the communication was made and what it contained. Once it is determined that the communication was made and what the contents were, the court is then to decide whether it is reasonably possible this communication altered the verdict. See Infelise, 813 F. Supp. at 611-12; citing, Haugh, 949 F.2d at 917. We agree with the Supreme Court that "in the interests of protecting the jury system, and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors." Tanner, 483 U.S. at 125, 107 S.Ct at 2750, 97 L.Ed.2d at 109; citing S.Rep. No. 1277, 93rd Cong., 2d Sess., p. 13-14 (1974); See also, United States v. Dotson, 817 F.2d 1127, 1130 (5th Cir.1987).
We adopt the view held by the Ninth Circuit in Hard that inquiry is subject to the following limitation; the "Federal Rules of Evidence 606(b) prohibits juror testimony about the deliberative process or subjective effects of the extraneous information". See Hard, 812 F.2d at 485; Abatino v. United States, 750 F.2d 1442, 1446 (9th Cir.1985). We conclude that in the course of post-trial hearings, juror testimony is only admissible as to objective facts bearing on extraneous influences on the deliberation process.

CONCLUSION
In sum, we find no error necessitating reversal on appeal. The circuit court did not err in striking Juror Turnage's and Juror Sartin's affidavits as the prerequisite showing under M.R.E. 606(b) for juror testimony was not met. Additionally, we conclude that any local rule or court procedure in this state which, after a showing warranting investigation, prohibits juror interviews, is expressly revoked. This rule holds true regardless of whether the prohibition was done under the auspices of the court. The procedures implemented here are to be hereafter uniformly applied to the courts of this state.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
McRAE, J., concurs in part and dissents in part with separate written opinion.
*420 McRAE, Justice, concurring in part, dissenting in part:
I applaud the majority's attempt to design a uniform approach to juror inquiry pursuant to M.R.E. 606(b). It has put to rest the old notion that an attorney may not talk with a juror after trial, but strikes a balance with the prohibition against juror harassment. Upon closer reading, however, I find gaps in the procedure which could keep all but the most blatant and egregious allegations of juror misconduct from ever reaching the hearing stage. Furthermore, I disagree with the majority's finding that the affidavits filed with the Gladney Estate's motion for a new trial did not meet its liberal threshold showing of good cause.
By focusing exclusively on the content of the two affidavits, the majority overlooks the circuit judge's error in finding that, procedurally, Gladney's attorneys had "completely ignored a long line of cases and a complete body of case law" by interviewing the jurors and obtaining affidavits without first notifying the court or opposing counsel. In Brake v. Speed, 605 So.2d 28 (Miss. 1992), we addressed the questions of how and when a party should raise the issues of "outside influence" or "extraneous prejudicial information" before the court in a motion for a new trial. In the course of presenting a motion for a new trial, Brake's attorney told the court that he had been approached by jurors who related that several other jurors had thought they had seen his client engaging in activities inconsistent with her alleged injuries, both before and during the trial. Brake, 605 So.2d at 36. The issue of juror misconduct, however, was not raised in the motion. Because of the restrictions contained in Rule 606 and Miss.Rules of Professional Conduct Rule 4.4, the attorney expressed his reluctance to secure affidavits from the jurors without court approval. Id. He then requested permission to secure affidavits, or in the alternative, to conduct a hearing to determine whether the jury had been subject to improper influences. We found that the attorney could have secured affidavits in support of any specific allegations raised in the motion, stating:

Counsel's reluctance to transgress ethical rules regarding contact with jurors does not quite justify his failure to do more, especially in light of the fact of his failure to seek the guidance of the court. There is no general prohibition against contact with jurors after they have been discharged. We are aware that some districts have local rules or practices preventing or inhibiting such contact but there is no indication in the record that the court here involved has such a rule. See Lawson v. State, 573 So.2d 684 (Miss. 1991).
Our Rules of Professional Conduct provide only that "a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden a third person, or use methods of obtaining evidence that violate the legal rights of such person." Mississippi Rules of Professional Conduct Rule 4.4 (1991). That rule encompasses the more specific provision, Mississippi Code of Professional Responsibility DR 7-108(d) "after discharge of the jury ... the lawyer shall not ask questions or make comments to a member of the jury that are calculated merely to harass or embarrass the juror." RPC Rule 4.4, Code Comparison. No provision prevents a lawyer from talking to a juror or securing affidavits from jurors to the effect that an "outside influence" was brought to bear. Miss.R.Evid. 606(b).
Id. at 36-37 (emphasis added).
The Gladney Estate's attorney followed the procedure generally recognized for impeaching a verdict by juror testimony under Federal Rule 606(b), which is identical to the Mississippi Rule:
Attacks on the validity of a verdict on the grounds of jury misconduct are usually raised by filing with the trial court a motion for a new trial. The motion is normally accompanied by supporting affidavits describing the misconduct. If the affiants are jurors, the affidavits are subject to Rule 606(b) and should only refer to matters which could be properly classified as extraneous prejudicial information or outside influences.
Wright & Gold, Federal Practice and Procedure: Evidence § 6076 (1990). Under our *421 decision in Brake, the attorney did what was necessary to raise the issue of juror misconduct in the motion for new trial. Had he done any less, he would have been subject to the same admonition suffered by Brake's attorney. Because neither 606(b) nor any rules of professional conduct were violated in obtaining the affidavits, the circuit court erred in finding that the affidavits were procedurally barred. The two jurors sought out the attorney to express their concern that the jury's decision was tainted by a variety of extraneous outside influences. The affidavits were taken at the attorney's office and recorded by a court reporter. This is not a case where the attorney hounded jurors in a down and dirty attempt to salvage a case. Were there any suggestion of browbeating or juror harassment, it would be appropriate to strike any affidavits and not allow a hearing.
It should be emphasized that the issue presented on appeal is whether the affidavits presented a threshold level of extraneous outside influence to show good cause for a hearing  not whether the affidavits, in and of themselves, contained sufficient evidence of juror misconduct to warrant a new trial. Because the circuit judge struck the affidavits on procedural as well as substantive grounds, the Gladney's attorney was precluded from offering any testimony at the motion hearing. We have stated that a new trial should not be granted in a civil case on grounds of juror misconduct "unless the circumstances indicate some prejudice, wrongful intent or unfairness." DeLaughter v. Lawrence County Hospital, 601 So.2d 818, 820 (Miss. 1992); Atwood v. Lever, 274 So.2d 146, 147 (Miss. 1973). In order to show good cause for a hearing, there is no need to establish actual prejudice, wrongful intent or unfairness. Where juror misconduct is alleged, the movant need only show by a preponderance of the evidence that the jury may have been subject to some extraneous prejudicial information. To suggest otherwise would place a heavier burden on the party raising the allegations than he would normally bear in a civil case. Moreover, too great a threshold would penalize a party which only learns of possible juror misconduct after a verdict has been rendered. Where such questions arise during the course of a criminal trial, we have held that "the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trial and not extraneous matters." Williamson v. State, 512 So.2d 868, 882 (Miss. 1987). I see no reason why the litigants' right to fair and impartial trial should be afforded any less protection in a civil case, whether the allegations arise before or after the final verdict.
In setting the standard which trial courts are to follow in determining whether there exists good cause sufficient to warrant a hearing on the issue of juror misconduct, we must not lose sight of the fact that, as in the case sub judice, most such allegations will be raised as part of a motion for a new trial. M.R.C.P.Rules 59(b) and (c) require that a motion for a new trial, as well as any affidavits upon which the motion is based, must be served within ten days of the entry of judgment. Thus, as a practical matter, time constraints as well as ethical considerations may serve to limit the number and extent of the affidavits an attorney is able to obtain prior to filing his motion. Those affidavits he does obtain may be merely the tip of the iceberg or they may prove fruitless. Regardless, because of the constrictions of Rule 59, any information gathered within the ten-day time frame should be viewed liberally by the trial court.
The majority states that while "a minimal standard of a good cause showing of specific instances of misconduct may be acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred." In so holding, it rejects more stringent standards followed in other jurisdictions. The majority's application of its standard to the facts of this case, however, appears to be contrary to the liberal showing of good cause it purports to have adopted. If the affidavits filed by the Gladney Estate in support of its motion for a new trial do not meet the majority's minimal showing of good cause standard, what must be shown to demonstrate the possibility of a specific, non-speculative impropriety?
It is well-established that unauthorized visits to the scene of a case as well as independent experiments conducted by jurors may *422 qualify as "extraneous prejudicial information" under Rule 606(b). Schmiz v. Illinois Central Gulf Railroad Co., 546 So.2d 693, 697 (Miss. 1989); Crawley v. Illinois Central Gulf Railroad Co., 248 So.2d 774, 776-777 (Miss. 1971). I recognize that in small towns, familiarity with an accident scene or a "visit" may be unavoidable. As the North Dakota court observed:
Undoubtedly, there will be situations, particularly in rural communities, where views of the accident scene by jurors are unavoidable. It is foreseeable that jurors may be called upon to sit on cases where the accident occurred at a major intersection in town, or even in front of the courthouse. A casual view by jurors in such cases is inevitable; however, without more, it is not likely to affect the verdict.
Keyes v. Amundson, 343 N.W.2d 78, 86 (N.D. 1983). All things considered, it would seem that alternate juror Turnage's "visit" to the scene, as the majority finds, was of little consequence.
The statements concerning juror Ed Mann's experiment with Patrolman Shackleford's method of counting center lines to determine visibility in the fog, however, are considerably more problematic. Despite Shackleford's own admission that it was not the "best" method of estimating visibility, allegations that Mann attempted to discredit that testimony are properly the subject of further inquiry. To allow a juror to report the results of his own independent experimentation within the confines of the jury room is tantamount to presenting an additional witness without preserving the right to confrontation. Crawley, 248 So.2d at 776.
Accordingly, while I find considerable merit to the procedure articulated by the majority, I have reservations about its application in light of the disposition of this case. Because the circuit judge refused to even consider the evidence introduced at the motion hearing, the case should be remanded for a hearing on the issue of juror misconduct and a new trial ordered if the allegations of improper experimentation bear fruit. While we cannot guarantee that every litigant receives a perfect trial, we have a duty to see that he receives a fair trial.