# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01305-COA

**QUARDERO GIPSON A/K/A QUARDERO M. GIPSON**  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

DATE OF JUDGMENT: 11/21/2022
TRIAL JUDGE: HON. SMITH MURPHEY
COURT FROM WHICH APPEALED: TALLAHATCHIE COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER
DISTRICT ATTORNEY: JAMES STEPHEN HALE JR.
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 07/30/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. A Tallahatchie County Circuit Court jury convicted Quardero Gipson of one count of conspiracy to commit armed robbery and one count of first-degree murder. The Tallahatchie County Circuit Court sentenced Gipson to serve five years for conspiracy and life imprisonment for first-degree murder, with both sentences to be served consecutively in the custody of the Mississippi Department of Corrections (MDOC). In his sole argument on appeal, Gipson contends that the circuit court erred by failing to grant a new trial due to potential juror bias and an improper external influence on the jury. Finding no reversible

error, we affirm.

## FACTS

¶2. A Tallahatchie County grand jury indicted Gipson and Quincy Scott for one count of conspiracy to commit armed robbery and one count of capital murder. As part of a plea deal, Scott agreed to testify against Gipson at Gipson's trial. Following the testimony and evidence, a jury convicted Gipson of one count of conspiracy and one count of first-degree murder. The circuit court ordered Gipson to serve a five-year sentence for conspiracy and life imprisonment for first-degree murder.

¶3. Gipson filed separate post-trial motions for a judgment notwithstanding the verdict and a new trial, respectively. Following a hearing, the circuit court entered an order denying both post-trial motions. Aggrieved, Gipson appeals.

## DISCUSSION

¶4. On appeal, Gipson does not challenge the evidence supporting his convictions but, instead, argues only that the circuit court erred by failing to grant him a new trial after the defense asserted "that the jury had been subject to multiple improper and outside influences . . . ." Specifically, Gipson contends that (1) potential bias arose due to connections that Jurors 149 and 92 had to people associated with the trial, and (2) in responding to a jury question, the bailiff improperly influenced the jury's deliberations. We "review the grant or denial of a motion for a new trial under an abuse-of-discretion standard." *Forrest v. State*, 376 So. 3d 404, 408 (¶9) (Miss. Ct. App. 2023) (quoting *Winner v. CSX Transp. Inc.*, 100 So. 3d 478, 486 (¶29) (Miss. Ct. App. 2012)).

2

## I.    Juror Bias

¶5.    At two different points during Gipson's trial, the State brought the potential for juror bias to the circuit court's attention.  Gipson asserts on appeal that the circuit court failed to sufficiently question the two empaneled jurors involved and to adequately investigate their potential for bias before allowing them to remain on the jury.

¶6.    The first instance arose after a lunch recess when the State informed the circuit judge of a potential bias issue involving Juror 149.  The prosecutor stated that he had received information that Juror 149 might share a child with Scott's uncle.  As previously explained, Scott was Gipson's co-indictee but had agreed to testify against Gipson as part of a plea deal.

¶7.    Upon the request of Gipson's attorney, the circuit judge questioned Juror 149 to ascertain the exact nature of her relationship, if any, with Scott's uncle.  In response to the circuit judge's questioning, Juror 149 answered that she was not married to Scott's uncle but did "talk to him."  In addition, Juror 149 stated that she did not know Scott.

¶8.    After the circuit judge finished questioning Juror 149, Gipson's attorney made no objection to Juror 149 remaining on the jury.  In fact, Gipson's attorney stated the following:

> [W]hile it seems . . . that [the connection] could pose a problem, I think at this degree of distance, her not being in a formalized relationship [with Scott's uncle, a]nd, obviously, she's already answered that she could be an impartial juror.  I don't think that this is one . . . that we need to request she be removed from the defense.

Thus, without any objection, the circuit judge ruled that Juror 149 would remain on the jury, and Gipson's trial resumed.

¶9.    At a later point in the trial, the State again informed the circuit judge of a potential

3

issue of juror bias. Outside the jury's presence, the attorneys and the circuit judge questioned Deputy Benjamin McKinney with the Tallahatchie County Sheriff's Department. Deputy McKinney stated that he worked as a narcotics investigator and had just received an unsolicited text message from a confidential informant about one of the jurors. According to the informant, Gipson had previously been in a relationship with a female juror. Deputy McKinney testified that the informant had proved to be reliable in the past but had given no "basis of reliability" for the information provided in the text message.

¶10. The parties agreed to have the circuit judge question Juror 92 about her potential connection to Gipson. In response to the circuit judge's examination, Juror 92 stated that prior to the trial, she had known of Gipson "[f]rom around the area" but had not personally known him. Juror 92 further stated that her daughter had gone to school with Gipson, and Juror 92 denied ever having been in a relationship with Gipson. Based on Juror 92's responses, Gipson's attorney stated that the defense had no concerns about her and asked that she remain on the jury. Without any further objection or discussion, the circuit judge granted the request.

¶11. In previously discussing a defendant's claim of juror impartiality, this Court stated:

> A defendant bears the burden of showing he was prejudiced by the jury selected or that the jury was biased or less than impartial. We have stated that the trial court has complete discretion to remove any juror that the trial court is convinced is not able to try the case without any bias or prejudice toward the State or the defendant. Since there is no firm rule guiding the courts in every given situation of voir dire examination, these matters must be determined on a case by case basis. An appellate court may not reverse a decision by a trial court regarding jury selection unless there is an abuse of discretion.

*Chisholm v. State*, 298 So. 3d 1046, 1050 (¶10) (Miss. Ct. App. 2020) (citations and internal

4

quotation marks omitted).

¶12. Our caselaw also recognizes that a defendant may fail to preserve an issue for appeal if he makes no contemporaneous objection at trial. *Giles v. State*, 282 So. 3d 519, 525 (¶¶14-15) (Miss. Ct. App. 2019). Here, the record reflects that the defense failed to object to the sufficiency of the circuit judge's voir dire of either Juror 149 or Juror 92. Moreover, the defense raised no objection to the circuit judge's decision to allow both jurors to remain on the jury. In fact, Gipson's attorney specifically declined to request that Juror 149 be removed and then actually requested that Juror 92 be allowed to remain on the jury.

¶13. In addition to noting Gipson's lack of objection at trial, we find no abuse of discretion in the circuit judge's ruling regarding Jurors 149 and 92. As the defendant, Gipson bears the burden to prove the jurors' bias. *Chisholm*, 298 So. 3d at 1050 (¶10). Upon careful review, we conclude that he failed to satisfy his evidentiary burden.

## II. External Influence

¶14. As previously discussed, Gipson also contends on appeal that the bailiff improperly influenced the jury. "We review the trial court's decisions concerning jury influence for an abuse of discretion." *Grimes v. State*, 361 So. 3d 179, 189 (¶24) (Miss. Ct. App. 2023).

¶15. In *Grimes*, this Court reiterated the established procedure a trial court should employ when faced with a party's claims of improper outside influence on a jury. *Id.* at 189-90 (¶¶25-26). As we stated in *Grimes*,

> In *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 418-19 (Miss. 1993), the Mississippi Supreme Court explained . . . that when an allegation of juror misconduct arises, the circuit court must first determine whether there is good cause to warrant further investigation by the court. *Id.* at 418. "In order for

5

the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption of jury impartiality." *Id.* "At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id.* at 419. "Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred." *Id.*

After a party presents a threshold showing of good cause that a jury may have been exposed to improper outside information, *Gladney* indicates that the trial court should conduct a post-trial investigative hearing. *Id.* At such a hearing, which could include questioning jurors about the extraneous information, "the proper procedure is for the judge to limit the questions asked the jurors to determine whether [the] communication was made and what it contained." *Id.* When the trial court determines that the communication was made and what the contents were, "the court is then to decide whether it is reasonably possible that this communication altered the verdict." *Id.*

*Grimes*, 361 So. 3d at 189-90 (¶¶25-26).

¶16. The record in the present case reflects that the bailiff heard a juror knock on the door during the jury's deliberations. The bailiff opened the door, and when the jurors asked him a question, he responded. Following the exchange, the bailiff informed the circuit judge of his interaction with the jury.

¶17. On the record and in the presence of both parties, the circuit judge questioned the bailiff. The bailiff explained that the jury had asked him what would happen if it was unable to reach a decision. The bailiff stated that he had responded, "Normally[,] it would be a hung jury." According to the bailiff, the jury then informed him that they had reached a verdict as to Count I but not as to Count II. The bailiff stated that he had told the jury that it "ha[d] to come to some type of decision[,]" but he denied that he had answered any legal questions for the jury.

6

¶18.   The defense raised concerns over the bailiff's interactions with the jury.  Specifically, Gipson's attorney asserted that any statement by the bailiff that the jury had to reach a decision could have swayed the jury in its deliberations.  In light of the defense's concerns, the circuit judge further examined the bailiff to ascertain exactly what he said to the jury. The bailiff stated that the jury's exact question to him had been, "What would happen if we [do not] come up with a decision in Count 2?"  The bailiff further stated that he told the jury, "Normally, it's a mistrial."  The bailiff then asked the jury if it wished to deliberate longer. When the jurors indicated that "they might have been two people away from a . . . unanimous decision[,]" the bailiff responded, "Well, maybe more deliberation might be required." Although the bailiff previously testified that he had told the jurors they "ha[d] to come to some type of decision[,]" he now clarified that he "did not tell them you all have got to come up with a verdict.  I did not say those words."

¶19.   The circuit judge allowed Gipson's attorney to also question the bailiff.  Gipson's attorney asked whether the bailiff had explicitly instructed the jury that it "need[ed] to come up with a decision[.]"  The bailiff responded that as far as he could recall, he had simply asked the jurors if they thought they might "need to do a little more collaboration on it[.]" When the circuit judge asked if there was anything further from the defense, Gipson's attorney stated, "[W]e'll have the opportunity to . . . poll the jury, if necessary.  And then if there is something needed, we can move forward at that time with anything, if that's a sufficient response."  Without further discussion, the circuit judge announced that the jury had reached a decision on the verdicts and ordered the bailiff to escort the jury back into the

courtroom. After the jury returned guilty verdicts for both conspiracy and first-degree murder, the defense requested that the circuit judge poll the jury. The poll revealed that the jurors had been unanimous in their verdicts.

¶20. After the circuit judge dismissed the jury, Gipson's attorney moved for a mistrial based on the bailiff's involvement with the jury. Deciding to "go ahead and actually address this now" while the jurors were still in the courthouse, the circuit judge cleared the courtroom of everyone but the parties and had the jury return. The circuit judge explained that he had "one question pertaining to the verdicts and a[n] interaction that the jury had with [the bailiff] during the deliberation process." The circuit judge then asked, "Was there anything pertaining to the interaction that you had when . . . your bailiff[] visited the jury room, was there anything that he said or did . . . that changed your decision and that you would otherwise not be voting guilty?" Each juror answered in the negative and affirmed that their verdicts were unanimous. The circuit judge concluded that the verdicts were "not the result of any interaction between the bailiff . . . and the jury."

¶21. In his motion for a new trial, Gipson renewed his argument that the bailiff had improperly influenced the jury. At the hearing on Gipson's post-trial motions, the circuit judge found that he had followed the steps in *Gladney* to ascertain if the jury had been improperly influenced during its deliberations. The circuit judge therefore stated that as to "the incident pertaining to the bailiff," he would not allow further inquiry into the jury's internal deliberations but would "stand[] by the transcript" that had been made after Gipson's attorney first raised the issue.

¶22. Upon review, we find that after good cause was shown, the circuit judge correctly held an investigative hearing to determine if the bailiff had provided extraneous information to the jury, the extent and specific content of any extraneous information given, and if it was reasonably possible that extraneous information had altered the jury's verdicts. *See Grimes*, 361 So. 3d at 189-90 (¶¶25-26). We further find, however, that the circuit judge erred by concluding with the additional question about whether the bailiff's statements to the jurors influenced their decision to find Gipson guilty. Mississippi "Rule of Evidence 606 does not permit 'any inquiry into the internal deliberations of the jurors.'" *Roach v. State*, 116 So. 3d 126, 133 (¶23) (Miss. 2013) (quoting *Gladney*, 625 So. 2d at 419). As the supreme court explained in *Roach*,

> [a] juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. But questioning of a juror must be limited to whether the communication was made and what it contained. It is inappropriate and a violation of Rule 606(b) for any juror to be questioned with regard to whether or not the extraneous information actually altered his verdict.

*Id.* (citations and internal quotation marks omitted).

¶23. Despite the circuit judge's final erroneous question about the effect of the bailiff's statements on the jury's verdict, we note that the remainder of the investigative hearing was thorough and complied with the requirements of *Gladney*. "Each juror was given the opportunity, when polled, to express any dissatisfaction with the verdict and the opportunity to vote without any jury deliberation room pressure." *Hayes v. Entergy Miss. Inc.*, 871 So. 2d 743, 748 (¶14) (Miss. 2004). No juror expressed any such dissatisfaction with the verdicts

9

or contrary vote to the verdicts. In addition, both the circuit judge and Gipson's attorney questioned the bailiff regarding the extent and specific content of his interaction with the jury.

¶24. Based upon the investigation conducted, the circuit judge concluded the testimony and evidence failed to show a reasonable possibility that the jurors' verdicts had resulted from their interaction with the bailiff. "Under the facts presented, and giving deference to the [circuit] judge's determination of the credibility of witnesses, we cannot say that the [circuit] judge" abused his discretion. *Roach*, 116 So. 3d at 134 (¶24). We therefore find no reversible error.

## CONCLUSION

¶25. Because we find no abuse of discretion in the circuit court's decision to deny a new trial, we affirm Gipson's convictions and sentences.

¶26. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**