777 So.2d 682 (2000)
Dayon JAMES a/k/a Dayon Hasan James, Sr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 96-KA-01058-COA.
Court of Appeals of Mississippi.
September 26, 2000.
*684 Joseph P. Hudson, James Donald Evans, III, Gulfport, Attorneys for Appellant.
Office of the Attorney General by Billy L. Gore, Attorney for Appellee.
EN BANC

MODIFIED OPINION ON MOTION FOR REHEARING
IRVING, J., for the Court:
¶ 1. On motion for rehearing, the original opinion is withdrawn, and this opinion is substituted. Dayon James a/k/a Dayon Hasan James, Sr. was indicted by the Grand Jury of the First Judicial District of Harrison County for two counts of capital murder while in the commission of felonious child abuse. He was convicted of count one[1] by a jury and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Following the verdict, James moved for a new trial on the basis of jury impropriety in the consideration of extraneous information and for a judgment notwithstanding the verdict. The motions were denied, and James appealed his conviction, assigning numerous errors which we quote verbatim from his brief:
I. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO QUASH THE INDICTMENT
II. THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S FIRST MOTION FOR DIRECTED VERDICT AT THE CLOSE OF THE STATE'S CASE
III. THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S SECOND MOTION *685 FOR DIRECTED VERDICT AT THE CLOSE OF THE STATE'S CASE
IV. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
V. THE TRIAL COURT ERRED IN DENYING APPELLANT'S COUNSEL'S REQUEST TO POLL THE JURY AS REQUESTED BY APPELLANT'S NOTICE OF JURY EXPOSURE TO EXTRANEOUS INFORMATION
VI. THE TRIAL COURT ABUSED ITS DISCRETION BY CONSIDERING APPELLANT'S FAILURE TO TESTIFY AS A FACTOR IN DENYING APPELLANT'S MOTION FOR JNOV, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL
VII. THE TRIAL COURT ERRED IN REFUSING TO PERMIT TESTIMONY REGARDING THE REASON FOR LACK OF HISTORY OF THE NEAR ACCIDENT IN THE MEDICAL RECORDS AS SAID TESTIMONY WAS ESSENTIAL TO APPELLANT'S THEORIES OF DEFENSE
VIII. THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-14
IX. THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-3
X. THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-12
XI. THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-19
XII. THE TRIAL COURT ERRED IN REFUSING JURY INSTRUCTION D-20
XIII. THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTION S-1
XIV. THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTION S-2
XV. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL ON THE GROUNDS OF IMPROPER JURY ARGUMENT.
XVI. THE TRIAL COURT ERRED IN GIVING THE IMPROPER STANDARD OF PROOF TO THE JURY PRIOR TO THE START OF TESTIMONY
XVII. THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO EXERCISE ITS PEREMPTORY CHALLENGES IN VIOLATION OF BATSON
Finding reversible error in the trial judge's refusal to poll the jury regarding the allegation of the jury's consideration of extraneous information, we reverse and remand.

FACTS
¶ 2. Dayon James, his wife, Toni, and their two children were living at the Willow Wood apartment complex in Gulfport, Mississippi in June 1995. Consuella Smith and her family also lived at Willow Wood in June 1995. Smith's family consisted of Smith, her three children and a live-in boyfriend, Kevin Keyes, who was also the father of one of Smith's children. The testimony at trial was that the two families had developed a close relationship and regularly babysat for each other.
¶ 3. On the morning of June 7, 1995, James agreed to watch Smith's youngest child, Shenekqua, a female infant approximately six weeks of age, at his and Toni's home while his wife, Toni, their two children, Consuella, and her other two children went shopping. Consuella brought Shenekqua over to the Jameses before she left on the shopping trip. When Shenekqua *686 was brought to the Jameses, Toni took her and placed her first in a room being occupied by James's sister, Princess, but removed Shenekqua to Toni and James's bedroom before leaving to go shopping. When Consuella and Toni returned to the apartment, they discovered that Shenekqua was limp and having trouble breathing. Shenekqua was rushed to Gulfport Memorial Hospital where she was seen in the emergency room.
¶ 4. Hospital records show that Shenekqua was brought to the emergency room at 2:30 p.m. on June 7, 1995. After Shanekqua was stabilized to the extent possible, she was transferred at or about 6:30 p.m. to the pediatric care unit at the University of South Alabama. A cat scan performed on Shenekqua on June 8, 1995, around 4:30 p.m. showed she had what was termed an acute hematoma on the brain. Three days later, on June 10, 1995, Shanekqua died.
¶ 5. An autopsy performed on June 11, 1995, generated a medical opinion that Shanekqua died from what is referred to as "shaken baby syndrome," although the pathologist who performed the autopsy changed his opinion during the trial to state the cause of death as "shaken baby impact syndrome." The following day James was arrested and charged with capital murder. Other facts relevant to the resolution of the issues will be discussed under the designated issues.

ANALYSIS OF ISSUES PRESENTED

I. Motion to quash the indictment

(a) The indictment failed to provide adequate notice of the charge.
¶ 6. James contends that the indictment is so vague and ambiguous that it does not apprise him of the charge with sufficient certainty and specificity to permit him to adequately prepare a defense, or to plead any judgment in the case at bar to any later proceedings against him based on the same alleged offense in contravention of Article 3 § 22 of the Mississippi Constitution and the double jeopardy clause of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment.
¶ 7. Specifically, James contends that how the injuries to Shanekqua occurred was not alleged in the indictment and no testimony or evidence was introduced at trial to define how the injuries occurred. James then asserts that the actual cause of the death of Shanekqua was modified from the witness stand on the date of trial from "shaken baby syndrome" to "shaken baby impact syndrome" and that the two are different. James further contends that the failure of the indictment to state specific facts indicative of his alleged conduct which constituted felonious abuse allowed the State the freedom to say he committed any one of several acts, all of which could result in the child being injured and resulting in "shaken baby syndrome" or "shaken baby impact syndrome." James's final contention in this regard is that the underlying facts necessary to establish the elements of the underlying felony of felonious child abuse are absent from the indictment and the evidence; therefore, the indictment is defective as it does not sufficiently apprise him of the charges against him. Thus, he claims, the burden of proof was improperly shifted to him at trial to prove what his actions were on the date in question when it was the State's burden to prove that his conduct fell within the statute.
¶ 8. The indictment reads, in pertinent part, as follows:
CAPITAL MURDERTWO COUNTS
Section 97-3-19(2)(f), Miss.Code of 1972, as amended
COUNT I
That: DAYON HASAN JAMES, SR.
in the First Judicial District of Harrison County, Mississippi, on or about June 10, 1995, did then and there wilfully, *687 unlawfully, feloniously and with or without design to effect death, kill and murder Shaneque Keyes, a human being, while in the
commission of the crime and felony of Felonious Abuse and/or Battery of a Child, as defined by Section 97-5-39(2), Miss.Code of 1972., as amended,
contrary to the form of the statue in such cases made and provided and against the peace and dignity of The State of Mississippi.
¶ 9. The Mississippi Supreme Court has made it "clear that the ultimate test, when considering the validity of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his defense." Medina v. State, 688 So.2d 727, 730 (Miss.1996). The indictment must be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him. Peterson v. State, 671 So.2d 647, 653-54 (Miss.1996); URCCC 7.06. The indictment is held to be sufficient if it contains the seven factors enumerated in URCCC 7.06.
1. The name of the accused;
2. The date on which the indictment was filed in court;
3. A statement that the prosecution is brought in the name and by the authority of the State of Mississippi;
4. The county and judicial district in which the indictment is brought;
5. The date and, if applicable, the time at which the offense was alleged to have been committed. Failure to state the correct date shall not render the indictment insufficient;
6. The signature of the foreman of the grand jury issuing it; and
7. The words "against the peace and dignity of the state."
Id.
¶ 10. The indictment in the case presently before this Court met these requirements. The indictment contained a charge of capital murder defined in Miss.Code Ann. § 97-3-19(2)(f). Therefore, the indictment was in compliance with Miss. Code Ann. § 99-17-20, and it is not necessary to specifically set forth the elements of the underlying felony used to elevate the crime to capital murder. Gray v. State, 728 So.2d 36, 71 (Miss.1998); Mackbee v. State, 575 So.2d 16, 34-35 (Miss. 1990); see Bullock v. State, 391 So.2d 601, 606 (Miss.1980); Bell v. State, 360 So.2d 1206, 1208-09 (Miss.1978). The indictment was sufficient because it informed James of the underlying felony although it did not set forth the facts constituting the underlying felony. This issue has no merit.

(b) Amendment to the indictment
¶ 11. James contends that it was error to allow the State to amend the indictment to change the date of the offense from "on or about June 10, 1995" to "on or about June 7, 1995." The amendment was allowed to correct the inadvertent insertion of the date of death of the victim instead of the date of the crime. As this amendment was one of form rather than substance, the trial judge did not err in permitting it to be made. Doby v. State, 532 So.2d 584 (Miss.1988); Norman v. State, 385 So.2d 1298 (Miss.1980); Shelby v. State, 246 So.2d 543 (Miss.1971); Deaton v. State, 242 So.2d 452 (Miss.1970); Miss.Code Ann. Section 99-7-5 (Rev.1994); Miss.Code Ann. Section 99-7-21 (Rev. 1994).

(c) Two count indictment
¶ 12. James alleges that the two counts of capital murder contained in his indictment were improperly joined under URCCC 7.07 and Miss.Code Ann. § 99-7-2 (Rev.1994). The counts were severed before James went to trial; therefore, any error that may have resulted from the joinder of the counts was cured when the counts were severed.

*688 (d) Grand Jury Evidence not Recorded

¶ 13. James claims that the only reason he was indicted is that false information was presented to the grand jury. He charges that he was not able to adequately challenge the indictment since he had no record from which to confront his accuser who testified before the grand jury, and was therefore, denied the opportunity and ability to impeach said accuser, all in violation of the Fourteenth Amendment of the U.S. Constitution and Article 3, § 22 of the Mississippi Constitution of 1890.
¶ 14. The general rule is that the accused has no right to inspection of the grand jury minutes for the purpose of trial preparation or discovery purposes. J.P. Ludington, Annotation, Accused's Right to Inspection of Minutes of State Grand Jury, 20 A.L.R.3d 7, § 3[a] (1968). However, if the defense can show a "particularized need" which outweighs the need for secrecy of grand jury proceedings, then the testimony might be released. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, (1959). The importance of maintaining the secrecy of grand jury proceedings is spelled out in URCCC 7.04 which states:
Grand jurors, except when called as a witness in court, shall keep secret the proceedings and actions taken in reference to matters brought before it, for six months after adjournment of the court at which they were grand jurors, and the name and testimony of any witness appearing before the grand jury shall be kept secret. No grand juror, witness, attorney general, district attorney, county attorney, other prosecuting attorney, clerk, sheriff or other officer of the court shall disclose to any unauthorized person that an indictment is being found or returned into court against a defendant or disclose any action or proceeding in relation to the indictment before the finding of an indictment or within six months thereafter or before defendant is arrested or gives bail or recognizance. No attorney general, district attorneys, county attorneys, or any other prosecuting attorneys or any other officer of the court shall announce to any unauthorized person what the grand jury will consider in its deliberations. If such information is disclosed, the disclosing person may be found in contempt of court punishable by fine or imprisonment.
See also Miss.Code Ann. § 13-5-61 (Supp. 1999).
¶ 15. In the case sub judice, there was no record of the grand jury proceedings, but even if there had been, James does not argue any "particularized need" that would override the policy for secrecy. This claim of error has no merit.

II. Motion for Directed Verdict
¶ 16. James contends that the trial court committed reversible error in denying his motion for a directed verdict at the close of the State's case-in-chief. However, when a defendant proceeds with his case following the denial of his motion for a directed verdict at the end of the State's case, he has waived the appeal of the trial court's failure to direct a verdict at that juncture in the case. Holland v. State, 656 So.2d 1192, 1197 (Miss.1995). James's claim of error on this issue is without merit. However, since James renewed his motion at the close of the case, we must consider the issue but from the perspective of all of the evidence.
¶ 17. Requests for a directed verdict and motions for JNOV implicate the sufficiency of the evidence. Franklin v. State, 676 So.2d 287, 288 (Miss.1996). The standard of review for a denial of a judgment notwithstanding the verdict, peremptory instruction and a directed verdict are identical. These motions test legal sufficiency as opposed to weight. Hart v. State, 637 So.2d 1329, 1340 (Miss.1994).
¶ 18. When one convicted of a criminal offense challenges on appeal the *689 legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidencenot just that supporting the case for the prosecutionin the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. Taylor v. State, 656 So.2d 104, 107-08 (Miss.1995); see also McFee v. State, 511 So.2d 130, 133-34 (Miss.1987) (citing Gavin v. State, 473 So.2d 952, 956 (Miss.1985); May v. State, 460 So.2d 778, 781 (Miss.1984)).
¶ 19. In support of his argument that he was entitled to a directed verdict or JNOV, James asserts that the State failed to prove (a) that he killed Shanekqua on June 7, 1995, while he was engaged in the commission of, or attempting to commit, the offense of felonious child abuse and/or battery, (b) more specifically that he intentionally, burned, tortured, whipped, struck or otherwise abused or mutilated Shanekqua in such manner as to cause serious bodily harm to her, in accordance with Miss.Code Ann. 97-3-19(2)(f) (Rev.1995) and Miss.Code Ann. 97-5-39(2) (Rev.1995), and (c) that the injury to Shanekqua was not accidental in accordance with Steele v. State, 544 So.2d 802, 808 (Miss.1989). James contends that the State did not produce any evidence which could reasonably, credibly and fairly exclude every hypothesis consistent with his innocence because no State witness alleged that his conduct caused the injury to Shanekqua.
¶ 20. It is undisputed that there was no direct evidence that James committed the crime for which he stands convicted. However, in advancing the argument that the State produced no evidence sufficient to sustain his conviction, James overlooks the fact that it is sufficient if the State presents evidence which circumstantially excludes all reasonable hypotheses consistent with his innocence. Hester v. State, 463 So.2d 1087 (Miss.1985).
¶ 21. The centerpiece of James's defense was that Shanekqua was injured prior to June 7, 1995, when she was entrusted to his care and that she exhibited symptoms of the injury as early as May 31, 1995, when she was admitted the first time to Gulfport Memorial Hospital but that medical personnel treated the child for sepsis instead of the head injury because the symptoms of sepsis are closely aligned with the symptoms of a head injury. James contended that Shenekqua received her injuries at the hands of someone else, or during a near-vehicle collision which occurred on or about May 31, 1995, when Shenekqua's mother, Consuella, had to come to a sudden stop to avoid hitting another car. At that time, Shenekqua was riding on the front seat as a passenger in a baby seat provided by the hospital for newborn babies.
¶ 22. We now turn to the evidence adduced at trial. Consuella, a witness for the State, testified that Shenekqua was asleep but okay when she left Shenekqua with James on June 7. She testified that the near collision was just that, a near collision and nothing more. She denied that Shenekqua was shaken up in any way during the mishap. She told several friends about the mishap, although she did not tell Kevin, Shenekqua's father, about the mishap out of fear of what he might do to her. Katrina Hall, a cousin to Consuella, testified that Consuella told her following Shenekqua's discharge from the hospital on or about June 3, 1995, that Shenekqua was still sick.
*690 ¶ 23. Consuella further testified that on the morning of June 7, 1995, she fixed Shenekqua a bottle of enfamil and cereal around 6:30 a.m. She testified that Shenekqua consumed the contents of the bottle, that Shenekqua seemed alright to her and that she did not notice anything unusual about Shenekqua. She said she took Shenekqua to the Jameses' house around noon, that at that time Shenekqua was asleep and she laid her on the couch. She testified that at that time Shenekqua appeared normal and okay and that if something had been wrong with her she would have noticed it. She also testified that she and Toni, James's wife, asked James to keep Shenekqua while she, Toni, and the other children went shopping.
¶ 24. Dr. Leroy Riddick, an Alabama forensic pathologist who performed the autopsy on Shenekqua, testified for the State. He reviewed the medical records from Gulfport Memorial Hospital and from the University of South Alabama. He testified that Shenekqua died from shaken baby impact syndrome, although his autopsy report only indicates shaken baby syndrome. It was his opinion that Shenekqua's head either hit something while she was being shaken or something was used to strike her on the head. He explained that after Shenekqua's brain had been soaked in formaldehyde for approximately two months, he did a more detailed examination and concluded that her head struck something during the shaking or was struck by something. He was also of the opinion that the symptoms which Shenekqua displayed upon being admitted to Gulfport Memorial Hospital would have developed either immediately after the injury or within twenty minutes after the injury and in no case more than an hour after the injury. This time line of course places the child within the custody of James at the time the injury would have occurred.
¶ 25. In June 1995, Lisa Michelle Bell lived across the street from Consuella in the Willow Wood Apartments. Lisa testified that she, Cynthia Adams, Monica Frambles and Monica Dixon were outside of Lisa's apartment on the night of June 6, 1995, around 11:00 p.m. She, along with the other ladies, saw Consuella leave Consuella's apartment and head toward James's apartment, carrying Shenekqua who was "hollering like something was wrong with it (sic)." According to Lisa, Consuella was shaking Shenekqua like she was trying to stop her from crying.
¶ 26. Cynthia Adams testified and supported the testimony of Lisa Bell except that Cynthia recalled it was raining slightly and that she saw Consuella walk back and forth from building to building about five times at the Willow Wood Apartments on the night of June 6, 1995. According to Cynthia, Shenekqua was crying during the entire time Consuella was walking back and forth. Cynthia also testified that Consuella was holding Shenekqua in a way that did not provide any support for Shenekqua's head.
¶ 27. Monica Dixon testified and corroborated Cynthia and Lisa's testimony in regard to seeing Consuella walk back and forth with Shenekqua outside of Willow Wood Apartments on the night of June 6, 1995. Monica stated that she saw Consuella on the outside with Shenekqua for about fifteen or twenty minutes and that Shenekqua was crying. Monica further testified that Consuella, while walking with Shenekqua, was not supporting Shenekqua's back and neck and that Shenekqua never stopped crying during the entire period.
¶ 28. Evelyn Michelle Stewart testified that she and Consuella grew up together and went to church together. She testified that she talked to Consuella approximately two days after Shenekqua's death. At that time, Consuella told her about the near collision. According to Stewart, Consuella said Consuella's son alerted her to the fact that she was close to hitting a car and that upon being alerted, she slammed on her brakes, causing Shenekqua to fall out of the car seat on to the floor and the other *691 baby to be propelled across the front seat. Evelyn further testified that Consuella said Consuella caught the second child who was propelled across the seat but was unable to catch Shenekqua.
¶ 29. Princess James, James's sister, was called by the State. She had recently had a baby and was planning to stay awhile with James and his wife. Her newborn baby had been transferred for treatment to a hospital in New Orleans. She, along with James and his wife, went to New Orleans during the early morning of June 6, 1995, and returned around midnight. The next morning, she came over to the Jameses' residence. She was there when Consuella brought the Jameses' children home and when Consuella brought Shenekqua over to the Jameses. When Consuella brought the Jameses' children home, she did not bring Shenekqua or her other children with her at that time. Princess testified that when Shenekqua was brought over to the Jameses, Shenekqua was asleep, and she never saw Shenekqua's eyes open the entire time of Shenekqua's stay. Shenekqua was placed on the bed in the bedroom which the Jameses had prepared for Princess. Shortly thereafter, according to Princess, she took a shower which lasted approximately ten minutes. When she came out of the shower, James was directly in front of the bedroom door. He had Shenekqua in his arms and was heading into the living/dining room area. Shenekqua was whimpering, and James had a baby bottle in his hand. Princess thought Shenekqua must have taken some of the contents in the bottle because a small amount was missing out of the bottle. However, James made the statement that Shenekqua was not drinking the contents of the bottle. After James made that statement, Princess said James put the bottle on the table.
¶ 30. Princess further testified that she then went into the room that had been prepared for her, and James went into the living room area. While she was in her room, James changed Shenekqua's diaper. When she came out of her room, James was changing Shenekqua's diaper again and told Princess that Shenekqua had "poop-pooped" again. After changing Shenekqua's diaper the second time, James placed Shenekqua on the bed in their master bedroom. James and Princess then started watching a video. Shenekqua started to whimper again. James went into the room where she was, and she became quiet. He returned to the living room and resumed watching the video with Princess. Shenekqua started to whimper again, and James went into the room again, followed in a few seconds by Princess. When Princess entered the room, she saw James cradling Shenekqua in his arms. He asked Princess if Shenekqua appeared to her to be breathing funny. Princess responded that she could not tell because the room was dark. She asked James to bring the child into the living room. When Shenekqua was brought into the living room, Princess observed that the child was indeed breathing funny, and her pupils were dilated. Princess also noticed a big ugly scratch on Shenekqua's neck but did not think anything about it because she had seen it a day or so earlier.
¶ 31. Princess also testified that she advised James to call 911, but that he said Consuella would get in trouble for leaving the child with someone. Princess then called her grandmother who advised that she would call 911. Shortly after Princess hung up the telephone from talking with her grandmother, Toni and Consuella pulled up in the car from their shopping trip.
¶ 32. Toni James, wife of the appellant, testified that she had kept Shenekqua on June 5, 1995, and that Shenekqua slept practically all day, at least seven hours. Toni said that she carried her husband to work that day and also carried Shenekqua with her. She said that Shenekqua did not wake up during the entire trip, did not move a muscle. Toni thought that was strange, and she informed Consuella about *692 it. Toni also testified concerning a conversation she had with Consuella wherein Consuella related the incident concerning the near collision. Toni testified that this conversation occurred prior to May 31, 1995.
¶ 33. Toni further testified that on the morning of June 7, 1995, Consuella brought the Jameses' children home. The Jameses' children had spent the night with Consuella. According to Toni, when Consuella brought the Jameses' children home, Consuella told Toni that Shenekqua was sick and had cried practically all night, sleeping for about only an hour on the night of June 6, 1995. Toni offered to take Shenekqua to the hospital, but Consuella declined the offer, saying she had given the child some Tylenol and that the child was asleep. Toni further testified that when Consuella brought the Jameses' children home, Consuella did not have her children with her, that she and Consuella talked for a short while before Consuella went back to Consuella's apartment and returned about twenty minutes later with Consuella's children. Toni also testified that when Consuella returned with the children, Shenekqua was asleep and that Toni laid Shenekqua across the bed in the nursery but removed her and placed her in the bed with James before she and Consuella left the apartment to do some shopping. Toni affirmed a statement that she had given to police to the effect that Shenekqua was awake when she placed her in the bed with James, although she maintained that she did not pay much attention to the child.
¶ 34. When Toni and Consuella returned from shopping, Toni entered the apartment while Consuella got the children out of the car. Toni related what happened as follows:
I pulled up at my apartment. Got out. Consuella was letting the children out the car, so she was still out. I unlocked the door and went in and saw my husband, Dayon, sitting on the couch with Shenekque laying across his lap and his sister sitting in the chair by the door on the telephone.
He had told me, you know, to come and look at her because she had trouble breathing and something was wrong with her. At that point I grabbed Shanekque and ran out the door, and I told Consuella to get in the car and let's go. And she said, what's the matter, and I said, Shenekque's sick, and she just stood there for a minute and said, see, I told you she was sick. I told you something was wrong with her, you know. And I said, get in the car and let's go.
On cross-examination, Toni stated that Shenekqua was limp, unconscious and having respiratory trouble when they returned to the apartment.
¶ 35. Dr. Alvin Jaffe, a pediatrician, testified for the defense. He was of the opinion that Shenekqua's injury could have occurred prior to her first hospitalization on May 31, 1995. He had no qualms with the treatment provided Shenekqua for suspicion of sepsis but thought that because of the blood found on May 31, 1995, in Shenekqua's cerebral spinal fluid and urine, the medical personnel at Gulfport Memorial Hospital should have evaluated Shenekqua for brain trauma as a possible cause of the blood. He found nothing in the medical records to explain the existence of blood on May 31, 1995, and June 7, 1995, in the spinal fluid and urine but thought the blood in the urine could have been caused either by trauma or the catheter which was inserted in Shenekqua's bladder and that the blood in the spinal fluid on June 7 may have resulted from the brain bleeding or the hematoma which was discovered on June 8. Dr. Jaffe also thought the rapid rate of growth of Shenekqua's head from birth until her admission on May 31 indicated that something was going wrong in her head.
¶ 36. Dr. Jaffe was of the opinion that the liver enzymes found in Shenekqua's blood on June 7 when she was admitted to Gulfport Memorial Hospital would not have been present before the expiration of *693 at least six hours following an injury. This time line would of course place the custody of Shenekqua with her mother and father at the time of the injury. On cross-examination, Dr. Jaffe admitted that there was a possibility that the injury could have occurred one or two hours prior to Shenekqua being taken to the hospital but that it was his opinion that the injury occurred before that time period. Dr. Radelate, a lawyer and a board certified clinical and anatomical pathologist, also testified for the defense. It was his opinion, based on a reasonable medical certainty, that the injuries to Shenekqua had to occur prior to noon on June 7, 1995. It also was his opinion based on a reasonable medical certainty that the various enzymes found in Shenekqua's blood at elevated levels when she was admitted to the hospital on June 7, 1995, could not have become that elevated in three hours. Of course if they could not have become elevated in three hours, the injury giving rise to the cause of the elevation could not have been inflicted while Shenekqua was in James's custody.
¶ 37. James, relying on Steele v. State, 544 So.2d 802 (Miss.1989) and State v. Insley, 606 So.2d 600 (Miss.1992), argues that his conviction must be reversed because the State failed to proved him guilty beyond a reasonable doubt and to the exclusion of every hypothesis consistent with his innocence. While there are some stark similarities between our case and Steele, we are not persuaded that the facts of our case place it within the grip of the Steele principles.
¶ 38. In Steele, James Robert Steele was convicted of capital murder of twenty-three month old Christina Sinclair. The Mississippi Supreme Court reversed and rendered the conviction. Because we find both the facts and the principles or conclusions of law announced in Steele to be extremely pertinent to our analysis of the case before us, we shall quote extensively first from the Steele facts and then the conclusions announced by the Steele court in reversing Steele's conviction. In Steele, the victim was left in the custody of the defendant who agreed to babysit her while her mother, Kathy Sinclair, who was the defendant's girlfriend, went to choir practice. These are the facts:
Sinclair was going to join her parents at choir practice, so Steele offered to babysit. When Sinclair left, shortly before 8 p.m., Christina was already dressed for bed. She was sitting on the floor of the den, playing with a new tea set. Steele was going to watch the World Series. The following is Steele's account, which account Steele first gave on the night of the incident, and continued to give throughout the investigation and proceedings.
Christina, who was being toilet-trained let Steele know she had to go to the bathroom. Steele took her to the bathroom, removed her disposable diaper, seated her on her trainer seat and returned to the ball game. Christina came back to the den a few minutes later and Steele went to find her diapers. They were damp and he could not find anymore, so he put a pair of her panties on her. Christina then said, "rock" and Steele rocked her while watching the game. After she fell asleep, Steele put her in her bed under the covers.
Fifteen or twenty minutes later, Christina came back to the den and wanted to be rocked again. Steele, intent on the game, did not notice when she fell asleep, but put her back in bed sometime later. Three to six minutes later, he thought he heard her whine. He went to check and she was lying on the floor, more of less parallel to the bed, with her head facing the head of the bed, and with her eyes wide open. Steele picked her up and as he put her back in bed, told her to go to sleep. He thought he placed her on her stomach and on top of the covers this second time. Two to five minutes later he thought he heard her again. This time, *694 the noise was unusual and he could not describe it.
He found Christina in bed. However, she was on her back, with her eyes rolled up in her head and she was gagging. Steele put his finger in her mouth to see if she had swallowed her tongue or if she had something lodged in her throat. Finding nothing, he "became really scared" and did not know what to do. He picked her up and rushed out the front door. When he picked her up, she appeared to pass out. He noticed that if he kept her moving or shook her, she would stay "half-way revived". Steele ran to a neighbor's house and let himself in their front door. The man of the house took Christina and the woman called an ambulance. Steele stated he told the man he had to keep her moving or she would stop breathing.
Christina's mother returned from choir practice just after the ambulance arrived. Steele gave Christina to a medic and went inside the Red's home to get Sinclair. He told her Christina had fallen out of bed and was hurt. As they were going back outside the Reds arrived and everyone went to the hospital. Steele's statement was introduced by the state as part of its casein-chief. At all times, Steele's only explanation for Christina's injury was that she must have fallen out of bed. X-rays and a CAT scan were performed immediately. The x-rays showed massive fracturing on the right side of the skull. The CAT scan showed the fracturing on the right side of the skull and swelling of the right hemisphere of the brain which was pushing the right hemisphere over into the space occupied by the left hemisphere.
Steele, 544 So.2d at 803-804 (emphasis added). There was also testimony in Steele about Christina being burned on her buttocks, but that evidence did not figure in the cause of death although it is discussed by the court in its analysis of the case as will be seen in the extensive quote of the court's analysis of the case.
¶ 39. All of the State's medical experts were of the opinion, based on a reasonable degree of medical probability, that Christina's fracture and brain injury were inconsistent with Steele's account. They opined that the injury was too severe to have been sustained by a fall from the bed from either a prone or standing position. Id. at 806. Two medical experts testified for the defense. Each of them testified that Christina's skull fracture and resulting brain injury were consistent with Steele's account. Id. at 807. The Steele court noted that "[t]he state's case against Steele necessarily hinged on expert medical testimony because the evidence was entirely circumstantial." Id. at 806. "The defendant's position [in Steele was] that he should have been granted a judgment of acquittal notwithstanding the verdict because the state failed to prove criminal agency beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence." Id. at 808.
¶ 40. In reaching its decision, the court in Steele offered the following analysis:
The question before the Court, then, is whether the state met its burden of proving criminal agency, such that a hypothetical, reasonable juror could find Steele guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. As we have often noted:
"It is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt; that when in any essential respect the state relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the state is true, and that throughout the burden of proof is on the state. It is our duty here to maintain these principles." Hester v. State, 463 So.2d 1087, 1093 (Miss.1985) and Hemphill *695 v. State, 304 So.2d 654, 655 (Miss. 1974) quoting Westbrook, 32 So.2d at 252.
Accepting the evidence in the light most favorable to the state, including all reasonable, favorable inferences, as we must, the circumstances support the state's hypothesis. The circumstances, however, do not exclude the reasonable hypothesis that Christina's injury was an accident, the exact cause of which remains unknown.
"It is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which vests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such existence cannot amount to proof, however great the probability may be." (Emphasis added). Hester, 463 So.2d at 1094, quoting Algheri v. State, 25 Miss. 584, 589 (1853).
The problem in this case is that the evidence "merely establishes some finite probability in favor of" the state's hypothesis. The state proved that Christina was burned by a hair dryer on October 8, 9 or 10, 1984. According to the testimony, the defendant probably did it between 8:00 and 9:30 p.m. on October 10, 1984, because the Reds and Sinclair stated that they neither burned Christina, nor noticed any marks before October 12, 1984. According to the nurse's testimony, however, the fact remains that the burns could have been inflicted by someone other than Steele on the 8th or 9th of October.
The state also proved that Christina probably did not sustain her head injury by falling off of her bed from a lying or standing position. After eliciting this testimony from medical experts, the state introduced Steele's tape-recorded statement concerning the events of the night of October 10, 1984. Taken in the light most favorable to the state, Steele's statement does not add anything to the jury's pool of knowledge. Steele's statement indicates that he does not know what occurred in Christina's bedroom. All of the favorable evidence considered, there is no evidence, satisfying the beyond a reasonable doubt and exclusion of every reasonable hypothesis consistent with innocence burden of proof, linking Steele with Christina's injury. The fact that Steele was alone with Christina for slightly more than an hour and a half does not give rise to a reasonable inference of guilt where it is merely more probable than not that Christina did not fall out of her bed from either one of the two positions about which the state's witnesses testified. For instance, the state did not exclude the possibility that Christina fell while jumping on her bed or climbing on her chest-of-drawers which was located twelve or thirteen inches from the head of her bed. The state's medical experts were not asked whether Christina could have sustained her head injury under those circumstances.

Steele, 544 So.2d at 808-809 (emphasis added).
¶ 41. In the case before us, both the State and defense agree that Shenekqua died from the complications brought on by a head injury. However, it is the State's contention that the head injury occurred while the baby was being shaken and that the symptoms Shenekqua exhibited upon admission to the hospital would manifest themselves either immediately, within twenty minutes, or at most within an hour of the injury. The defense contends that Shenekqua was injured by someone else prior to James's taking custody of Shenekqua and offers a possible explanation that the injury occurred in a near collision approximately a week earlier when, according to one of the defense witnesses, *696 Shenekqua was thrown from her car seat onto the floor of the car.
¶ 42. The defense seeks to bolster its contention by pointing out that Shenekqua's head had shown signs of possible swelling as early as May 31, 1995, based on the huge difference in her head size at birth and what it was on May 31, 1995. The defense also points to the fact that on May 31, 1995, Shenekqua was admitted with a diagnosis of sepsis and that the symptoms manifested by sepsis and by a head injury are similar in many respects. The defense argues that while sepsis was eventually ruled out, a head injury diagnosis was not because no cat scan was done during the May 31 to June 3, 1995 hospitalization. The State discounts the defense theory, saying Shenekqua was discharged from the hospital on June 3, 1995, as a well baby. The defense counters that the State did not prove Shenekqua was discharged a well baby because of the failure to do the cat scan and because of the blood in her urine and cerebral spinal fluid, both symptoms of a head injury. The defense also points to the testimony that Shenekqua was sick the night of June 6, 1995, which would be before the critical time line relied upon by the State.
¶ 43. In our view of the record, proof of the following facts is indispensable to the State's theory of the case: (1) that Shenekqua was discharged a well baby on June 3, 1995, (2) that the symptoms which Shenekqua exhibited upon admission to Gulfport Memorial Hospital at or about 2:30 p.m. on June 7, 1995, manifested themselves either immediately, within twenty minutes, or at most within an hour of the injury that caused her death, (3) that the admission symptoms were consistent with an injury caused by Shenekqua being shaken profusely and could not have been caused by a head injury unrelated to the shaking, or if caused by a head injury unrelated to the shaking, that the symptoms which would have emanated from that other head injury would have manifested themselves at an earlier time.
¶ 44. Viewing the evidence in the light most favorable to the State as we must, we conclude that the State proved (1) that Shenekqua was discharged a well baby on June 3, 1995, and (2) that the symptoms which Shenekqua exhibited upon admission to Gulfport Memorial Hospital at or about 2:30 p.m. on June 7, 1995, manifested themselves either immediately, within twenty minutes, or at most within an hour of the injury that caused her death. We arrive at these conclusions because, though the evidence on the issues was hotly contested, the jury was entitled to believe the State's witnesses and the hypothesis supported by those witnesses' testimony. We also find that the State proved that Shenekqua's admission symptoms were consistent with an injury caused by her being shaken profusely. We further conclude that the State proved that the admission symptoms could not have been caused by a head injury unrelated to the shaking, or if caused by a head injury unrelated to the shaking, that the symptoms which would have emanated from that other head injury would have manifested themselves at an earlier time. Thus, we conclude that the State did indeed prove its hypothesis regarding Shenekqua's death.
¶ 45. Having determined that the State did prove its hypothesis regarding Shenekqua's death, however, does not end the matter. It is at this juncture where James contends the State's evidence is lacking and that Steele requires us to reverse and render his conviction. In his brief, James compares the symptoms of sepsis with symptoms of a head injury and because of their similarities, concludes that the physicians made the wrong diagnosis on May 31, 1995, when they made the sepsis diagnosis. He then postulates that it was the complications stemming from the lingering untreated head injury which necessitated Shenekqua's readmission on June 7, 1995, and which ultimately caused her death. We agree that James offered competent evidence to support his hypothesis as to what caused Shenekqua's death. That *697 fact, however, does not require us to reverse his conviction because the jury in the discharge of its function could reject that hypothesis as unreasonable or unpersuasive.
¶ 46. While it is true that in a circumstantial evidence case, the State must exclude every reasonable hypothesis consistent with innocence, we believe the State meets its burden in this regard when it produces competent evidence tending to refute all reasonable hypotheses consistent with innocence. It is up to the jury to decide whether the State has succeeded in doing so, and the jury, in making that determination, is empowered to examine all hypotheses advanced by both the State and the defense, as well as any other reasonable hypotheses consistent with innocence that are evident from the evidence or lack thereof, whether such hypotheses were advanced by the defense or not.
¶ 47. In our opinion, Steele does not stand for the proposition that, in a circumstantial evidence case, the offering by the defense of a hypothesis consistent with innocence renders the State's evidence of a hypothesis, consistent with guilt, insufficient as a matter of law to sustain a conviction. Were this to be the rule, the function of the jury as the ultimate fact finder and arbiter between disputed and competing hypotheses would be rendered meaningless. A close reading of Steele clearly shows that the court, in reversing the conviction, did not hold that the failure of the jury to accept the reasonable hypothesis urged by the defense warranted the reversal. We read Steele as simply holding that all reasonable hypotheses consistent with a defendant's innocence must be placed before the jury for the jury's acceptance or rejection, and the failure of the State to do that mandates a reversal of the defendant's conviction. Thus, in Steele, the Steelecourt reversed the defendant's conviction because the State failed to present to the jury, and thus have the jury exclude or accept, the hypothesis that Christina's injury may not have been caused by a criminal act of the defendant although the act occurred while Christina was in the defendant's custody.
¶ 48. We have thoroughly searched the record of the case at bar and cannot ascertain any hypothesis not placed before the jury that would explain how Shenekqua's injury could have occurred while in James's custody without his being the precipitating criminal agent. In our search, we have considered all of the theories advanced by James. However, all of those theories were placed before the jury and apparently rejected. It is not sufficient that some or all of the hypotheses advanced by James seem perfectly consistent with his innocence. They must pass through the time honored judgment of the jury which in our jurisprudential system is the ultimate determinant of what is reasonable or unreasonable and what has or has not been proven and, in the case of circumstantial evidence cases, what hypotheses have or have not been excluded. It necessarily follows from what we have said that we find sufficient evidence in this record to support James's conviction. Accordingly, this assignment of error is overruled.

III. Jury Exposure to Extraneous Information
¶ 49. The guilty verdict in James's trial was returned on July 13, 1996. On July 16, 1996, James's counsel learned from Wanda Conway, a member of the original prospective jury panel, that certain irregularities relating to jury misconduct had occurred. On July 22, 1996, James filed a notice of jury exposure to extraneous information with the trial court. On the same day, James also filed a supplemental motion for judgment notwithstanding the verdict, or in the alternative, for a new trial which included the allegation that the jurors were exposed to inadmissable evidence.
¶ 50. A hearing was held on this issue on August 14, 1996, during which Wanda Conway testified to the following:

*698 She was a member of the prospective jury panel at James's trial. During voir dire the jury was instructed to refrain from discussing matters related to the trial. During the lunch break, she had lunch with three other members of the prospective jury, namely, Paula Dedeaux, Shawn Watson, and Juanita Hathorne. Questions regarding the nature of the trial came up and Paula Dedeaux informed the rest of the group that
James was on trial for murdering two children. One member of the group, Shawn Watson, was eventually selected and served on James's trial jury.
¶ 51. Following the verdict, Conway had a discussion with Shawn Watson regarding the jury deliberations. Conway recounted that conversation:
Yes. She said that they knew, some of the people in there knew about the second child and that they kept bringing it up. Said, well, you knowshe was saying that they was saying he was guilty because it was two children. She said she was one of the ones that kept saying we don't know if there were two children or not; we can only go on this child here. She said several of them, and she never mentioned any names or anything, she kept saying several of them knew. And she also mentioned thatbecause she asked me had I seen the docket sheet out front because some of them saw that he was charged with something else. I told her I hadn't seen the docket. She said the docket sheet said one of two, or first case, or something like that. She said she hadn't seen it either but they were discussing it.
¶ 52. Conway explained that the portion of the above quoted passage referring to a docket sheet concerned a docket sheet that was posted during the jury voir dire portion of James's trial. James asked the trial court to take judicial notice of the fact that the docket sheet was posted. The trial judge's response was a statement for the record that for two or three months prior to that day someone from the clerk's office had been posting a docket sheet and that while he could not say that the docket sheet specifically mentioned by Conway was posted, he was "certain that it probably was posted outside the door of [the] courtroom on the day that the jury came in for initial voir dire."
¶ 53. The trial court ultimately ruled that it was satisfied under Gladney v. Clarksdale Beverage Co., 625 So.2d 407 (Miss.1993) that there was no threshold showing that further inquiry should be made as to the specific juror, Ms. Watson.
¶ 54. Gladney set out the procedure for trial judges to employ in alleged juror misconduct cases as follows:
As a beginning to this inquiry, the trial court and opposing counsel must be made aware of any potential juror misconduct when this evidence is manifested. Thus, if a juror approaches an attorney for one of the parties or the court itself, or if either
subsequently learns such through alternative means, all parties involved should be made aware of the allegation as expeditiously as possible.
Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality. At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.
Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred. The sufficiency of such evidence shall be determined by the trial court if a post-trial hearing is indeed warranted under these standards.

*699 In the absence of a threshold showing of external influences, an inquiry into the juror verdict is not required. When the threshold showing is made under the standards previously outlined, the court should conduct a post-trial hearing. The scope of the hearing is, however, limited; the proper procedure is for the judge to limit the questions asked the jurors to determine whether the communication was made and what it contained. Once it is determined that the communication was made and what the contents were, the court is then to decide whether it is reasonably possible this communication altered the verdict. We adopt the view held by the Ninth Circuit in Hard that inquiry is subject to the following limitation; the "Federal Rules of Evidence 606(b) prohibits juror testimony about the deliberative process or subjective effects of the extraneous information". See Hard, 812 F.2d at 485; Abatino v. United States, 750 F.2d 1442, 1446 (9th Cir.1985). We conclude that in the course of post-trial hearings, juror testimony is only admissible as to objective facts bearing on extraneous influences on the deliberation process.
Id. at 418-19.
¶ 55. The record indicates that the first step of this process was followed in accordance with Gladney. Counsel for James promptly notified the trial court and the district attorney's office of the suspected juror misconduct. A hearing was held on the matter, and testimony was taken, resulting in a finding by the trial court that James did not present a threshold showing that warranted further investigation. It is our determination that the trial court abused its discretion in making this finding.
¶ 56. Mississippi Rule of Evidence 606(b) provides, in pertinent part, as follows:
(b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (emphasis added).
¶ 57. Inquiry into a jury's decision is thus prohibited except to determine whether the jury was exposed to extraneous prejudicial information or outside influence. James contends that the testimony of prospective juror Conway regarding remarks made by trial juror Shawn Watson met the threshold requirements to trigger an investigation into the jury's conduct. We agree, and find the case of Hickson v. State, 707 So.2d 536 (Miss.1997) instructive in resolving this matter. Unlike the case at bar, Hickson involved the question of change of venue; however, the venue issue was resolved on the collateral issue of jury exposure to extraneous information.
¶ 58. Hickson was tried and found guilty of sexual battery. Hickson, 707 So.2d at 541. Following his conviction, Hickson filed a motion for a new trial on the grounds of jury misconduct, alleging that the jury had received improper extraneous information. Id. At a hearing under M.R.E. 606(b), he called three of the jurors from his trial to testify, all of whom testified that during deliberations another juror asked whether anyone had heard of any other charges being brought against Hickson. Id. The trial court summarily denied Hickson's motion, and this Court rejected his appeal finding that there was no evidence that the jury had discussed *700 the alleged other charges and that the jury foreman had taken action to stop discussion in a timely manner which prevented any prejudice. Id. The Mississippi Supreme Court granted certiorari and held as follows:
It is, therefore, this Court's conclusion that the trial court abused its discretion in not changing venue in this case as the record evidence indicates that the Jones County community was exposed to pretrial media publicity that was of such a character and content that Hickson could not have received a fair and impartial trial, evidenced in part by the improper question posed by a juror during jury deliberations about another charge against Hickson. Thus, we reverse and remand this matter for a new trial.
Hickson, 707 So.2d at 544. (emphasis added).
¶ 59. In reaching its decision, the Mississippi Supreme Court noted that:
Where the resolution of a case comes down to factual disputes, the jury's role becomes paramount as it weighs the credibility of the witnesses and determines which factual accounts to accept or reject. Thus, it is absolutely imperative that the jury be unbiased, impartial, and not swayed by the consideration of improper, inadmissible information. We can not say, with any degree of certainty, that this was the case here because the fact of the matter is that the juror "threw the proverbial skunk into the jury [room]" during the deliberations by asking about other charges against Hickson. See Dunn v. U.S., 307 F.2d 883, 886 (5th Cir.1962) ("`[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it'").
Id.
¶ 60. As in Hickson, the case at bar also came down to factual disputes. Both the State and James presented numerous witnesses, including medical experts. It was essential that the jury not be affected by outside influences and prejudicial extraneous information in order to properly consider the evidence and weigh the credibility of witnesses. The trial court was particularly concerned that the multiple count indictment would taint the jury as evidenced by its decision early on to sever the counts. The case at bar involved the count one charge of capital murder of Shanekqua Keys. Count two of the indictment involved the capital murder of Shanekqua's half-brother, Alonzo Smith, who had been left in James's care while Shanekqua was in the hospital being treated for injuries allegedly caused by James. It should be obvious to anyone that allegations that two children falling suddenly ill at different times on the same day and under similar mysterious circumstances while in the same person's care, would be highly prejudicial and could easily allow a jury to find that because the same type of crime allegedly occurred a second time, that the individual was guilty of the first crime. It is our conclusion that Conway's testimony more than satisfied the minimum requirements of Gladney and provided a sufficient basis for the trial court to hold a hearing for the purpose of determining whether extraneous prejudicial information was introduced into the jury's deliberations concerning the death of the other child. Consequently, we remand the case to the trial court for that purpose.

IV. Court's Question Regarding James's Failure to Testify
¶ 61. James claims that the trial court improperly considered his decision not to testify as a factor in denying his motion for JNOV, motion for a new trial, and request to poll the jury, all in violation of his constitutional rights. The record reflects that the criticized statement was made during the hearing on the merits of James's post-trial motion for new trial. James had argued the holding in Steele v. State, 544 So.2d 802 (Miss.1989) in support of his motion. The trial judge asked the State for its position regarding factual distinctions *701 between Steele and the case at bar. After the State gave its response, the trial judge inquired as follows:
THE COURT: What's thedo you place any significance on the fact that in Steele, Mr. Steele I believe testified and gave his explanations and in this case Mr. James did not? Is there any significance to that?
We find that the statement was made within the confines of judicial consideration of the facts and arguments before the trial court at the time of the hearing. We do not find that this statement evidences any improper motive on the part of the lower court. This issue has no merit.

V. Near Accident History and the Medical Records
¶ 62. James contends that it was reversible error for the trial court to refuse to allow the jury to hear testimony regarding his theory of why the medical records did not contain any mention of the near accident. James claims that his theory that the absence of this information from Shanekqua Keyes's medical record resulted in the failure of the doctors to diagnose her injuries during the May 31st hospitalization and is supported by otherwise credible evidence.
¶ 63. The jury heard Shanekqua's mother, Consuella Smith, testify about a "sudden braking" incident approximately a week prior to June 7, 1995. She stated that she did not tell Kevin Keyes, the victim's father, about the near accident because she thought he might get upset since she was driving without a driver's license. Smith also admitted that she did not tell the police or the hospital doctors or social workers about the sudden braking. However, the near collision itself was fully explored during cross-examination, and James put on his own witnesses who gave testimony about what Smith said to them about the incident. So the jury was fully aware of why the medical records were silent as to the history of the near accident. We are at a loss to understand what more the jury needed to hear, and since James failed to state with specificity what other evidence he would have presented, we find that this issue is without merit.

VI. The Jury Instructions
¶ 64. James makes seven assignments of error regarding jury instructions. We have reviewed the granted and rejected instructions about which James complains and have found his assignments of error to be sufficiently without merit so as not to warrant a replication or discussion of any specific instructions. It is sufficient to say that we have read all of the other instructions given by the trial court and conclude that the jury was properly instructed on the law and facts. James's assertion that additional instructions were necessary in order for the jury to fully discharge its function is without merit. Likewise, his assertionthat the failure of the court to require the jury to make specific findings of fact regarding the acts alleged to have been committed by him in the process of committing the offense of felonious child abuse amounts to reversible erroris without merit. The jury was instructed on the elements of the offense. James's assertion to the contrary notwithstanding, we hold that the jury is not required to make findings of fact on the specific acts constituting each element of the offense. We hold that when a jury has been properly instructed on the essential elements of the offense, as was the jury in this case, a finding that the defendant is guilty of the offense charged is necessarily a finding that the defendant committed acts sufficient to constitute each element of the charged offense.

VII. Improper Jury Argument
¶ 65. James contends that it was reversible error for counsel for the State to argue facts not in evidence to the jury. He alleges that the State's attorney improperly argued that Shanekqua Keyes was shaken by James when there were no *702 facts in evidence before the jury that James committed any act or omission which injured Shanekqua Keyes. James cites Blue v. State, 674 So.2d 1184, 1214 (Miss.1996) in support of his argument:
Prosecutors are afforded the right to argue anything in the State's closing argument that was presented as evidence. Hanner v. State, 465 So.2d 306, 311 (Miss.1985) citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). However, arguing statements of fact which are not in evidence or necessarily inferable from it and which are prejudicial to the defendant is error. Tubb v. State, 217 Miss. 741, 64 So.2d 911 (1953). Thus, it is a general rule that prosecuting attorneys should refrain from commenting upon the appearance of a defendant when he has not been introduced as a witness. Reed v. State, 197 So.2d 811, 815 (Miss.1967). Moreover, prosecuting attorneys should refrain from doing or saying anything that would tend to cause the jury to disfavor the defendant due to matters other than evidence relative to the crime. Sumrall v. State, 257 So.2d 853 (Miss.1972). (emphasis added).
¶ 66. We find that the facts complained of by James were necessarily inferable from other facts that were properly before the jury. Further, given the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety. Ballenger v. State, 667 So.2d 1242, 1270 (Miss.1995). James concedes that there was testimony in evidence from the State's witness that Shanekqua Keyes suffered from trauma identified as shaken baby impact syndrome. James argues that the word shaken does not mean in every instance that the child was shaken by an individual, but that the child's brain has been shaken internally as a result of some physical force or motion being inflicted upon the child. We find that it is obvious that it may reasonably be inferred from this evidence that someone shook the child, and since James is charged with causing the injury that led to the child's death, it does not prejudice James for the prosecutor to argue that James shook the child. This issue has no merit.

VIII. Improper Standard of Proof
¶ 67. James argues that the trial court committed reversible error by misleading the jury as to the standard of proof required in the instant case at the start of trial. He refers to the following comments made by the trial judge during the initial stages of voir dire to the prospective jury panel: "the burden placed upon the State of Mississippi in every criminal action is proof beyond a reasonable doubt." James claims that this statement was misleading because the burden of proof in his case was beyond a reasonable doubt and to the exclusion of every reasonable hypothesis.
¶ 68. James's claim completely ignores the fact that the jury that was selected and which heard and rendered the verdict in his case was given jury instruction C-3, and S-1 as part of the court's charge to the jury, each of which instructed the jury that James was to be found guilty only if the State had proved him guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis. There is no merit to this assignment.

IX. The Batson Violation
¶ 69. James contends that the trial court committed reversible error in excluding black female jurors from service in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In support of this claim he alleges that the State attempted to exclude black female jurors Eva Sullivan, Catherine Bradley and Gloria Walker. He claims that in addition to those black females, the State attempted to assert a peremptory challenge to Wanda Conway, another black female. The operative word in each of these claimed instances of Batson violation *703 is "attempted". There is no proscription against an attempt to exclude jurors under Batson.
¶ 70. Prospective juror Sullivan was challenged peremptorily by the State on the grounds that she had been the victim of a burglary and because a friend of her stepdaughter's was scheduled to testify at James's trial. The trial court accepted those reasons as being race-neutral, and we find no basis for overturning its ruling. Prospective jurors Bradley and Walker were challenged for cause, but the State's proffered grounds for cause were not accepted. Each of them remained on the panel. Prospective juror Conway was struck for cause on the basis of a reason brought to the attention of the trial judge by counsel for James. No violation of Batson has been demonstrated in this case. This assignment is without merit.

CONCLUSION
¶ 71. We find no reversible error in this case other than the trial court's refusal to poll the jury regarding the extraneous matter discussed in part III herein. As previously stated, the case is remanded to the trial court for the purpose of holding a hearing to poll the jury regarding the referenced matter. The court is directed to hold an on-the-record polling hearing within ninety days or as soon thereafter as feasible to determine if extraneous matter was discussed during jury deliberations. The court is not authorized or directed to question jurors about their deliberations beyond that permitted by M.R.E. 606(b); the poll is simply for the purpose of determining whether extraneous matter was discussed or mentioned. If the court concludes from the poll that the jury did in fact discuss the extraneous matter of the death of the second child during the jury's deliberations, it shall, on its own and without further interrogation of the jury, determine the extent of the discussion and evaluate the impact, if any, that the discussion had on the jury's verdict in this case, being guided by the teachings of Gladney. If the court determines that the jury's verdict was influenced by this information, notwithstanding the other evidence which the jury may have concluded pointed to James's guilt, then it shall grant James a new trial. On the other hand, if the court determines that no extraneous matter was discussed or that the discussion of such matter did not influence the jury's verdict, it shall certify to this Court its findings in this regard, along with a copy of the transcript of the hearing.
¶ 72. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, IS REVERSED AND THE CASE REMANDED FOR FURTHER ACTION CONSISTENT WITH THIS OPINION. ALL COSTS ARE ASSESSED TO HARRISON COUNTY.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., AND LEE, J., CONCUR. MOORE, J., DISSENTS WITH SEPARATE WRITTEN JOINED BY BRIDGES, PAYNE, AND THOMAS, JJ. MYERS, J., NOT PARTICIPATING.
MOORE, J., dissenting:
¶ 73. I respectfully dissent from the majority's ruling to reverse and remand. I would affirm the judgment of the Harrison County Circuit Court, therefore holding that the circuit court did not commit reversible error in its refusal to poll the jury regarding the allegation of the jury's consideration of extraneous information.
¶ 74. The trial court, in making its decision on this particular issue, ruled that it was satisfied under the requirements of Gladney v. Clarksdale Beverage Co., 625 So.2d 407 (Miss.1993) that there had been no threshold showing that further inquiry should be made as to the specific juror, Shawn Watson, or to the other jurors. The supreme court in Gladney set out the procedure for jury inquiry in Mississippi. In following the procedure, trial judges investigate jury misconduct and extraneous influences. The Gladney court stated *704 that after an allegation of jury misconduct has been made, the next step is to consider whether investigation is warranted. Id.
In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality.... At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.... Although a minimal standard of a good cause showing ... is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred, and the sufficiency of such evidence shall be determined by the trial judge.
Id. at 419. Without this threshold showing of external influences, further inquiry is not required. Id.
¶ 75. As stated, appellant James was not successful in his attempt to make this threshold showing warranting further investigation. The majority agrees that the trial judge applied the correct legal standard as required by Gladney. However, in reversing the lower court, the majority concluded that the testimony of Wanda Conway, a venireman but not a member of the James jury, more than satisfied the minimum requirements of Gladney, and that the trial judge committed an abuse of discretion in ruling to the contrary. I disagree.
¶ 76. Wanda Conway was the only witness to testify in support of the allegations of extraneous influence. Conway was a biased witness with an agenda. She testified that she was "shocked" by the guilty verdict and that she called her friend Shawn Watson, a trial juror, to "find out" about the verdict. Conway also expounded her unfounded opinion of the case: that James was innocent and that the mother was guilty of causing the accidental death of the child. There were no affidavits or testimony from any trial juror concerning extraneous prejudicial information, although this evidence would have been allowed under M.R.E. 606(b). The trial judge properly ruled that the testimony of Conway was inadequate to overcome the presumption of jury impartiality. See United States v. Ruggiero, 56 F.3d 647, 651 (5th Cir.1995) (quoting United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir. 1983)).
¶ 77. In an attempt to support the argument that the trial judge committed an abuse of discretion in deciding that further inquiry was not required, the majority cites Hickson v. State, 707 So.2d 536 (Miss. 1997), as authority. In actuality, Hickson is distinguishable from the present case. In Hickson, the supreme court held that the trial court abused its discretion in not changing venue when the surrounding circumstances warranted a change. Hickson, 707 So.2d at 544. This is not on point nor determinative of the issue at hand.
¶ 78. Although appellant James did not raise this as an assignment of error on appeal, I would like to address the posted docket sheet. During her testimony, Conway asserted she had been informed that some of the jurors had seen the docket sheet posted outside the courtroom which stated James was charged with more than one crime. The trial judge admitted that the docket sheet must have been posted the day the jury came in for initial voir dire. However, he stated that the possibility of this becoming problematic was extinguished during voir dire when all potential jurors were questioned as to whether or not they had any knowledge of the case, as well as the source of that knowledge. The trial judge correctly found this point to be irrelevant as to the issue of extraneous influences.
¶ 79. The majority states that the trial court abused its discretion in finding that further investigation was not warranted. This was an issue of fact addressed by the trial judge. It is clearly settled law that *705 such a finding of fact by a trial judge "is entitled to the same deference as a jury verdict and will not be reversed upon appeal unless manifestly wrong" Jenkins v. State, 607 So.2d 1137, 1138 (Miss.1992), or unless it is found to be clearly erroneous. Neal v. State, 451 So.2d 743, 753 (Miss. 1984). There is no evidence demonstrating that the trial judge's finding was either manifestly wrong or clearly erroneous. It was within his discretion to consider and weigh the testimony of Wanda Conway along with the other relevant factors.
¶ 80. In this state there is a presumption of jury impartiality and there is a general reluctance after the verdict to haul in and probe jurors for potential instances of bias, misconduct, or extraneous influences. Each juror should be free from harassment and secure in their verdict. Gladney, 625 So.2d at 418.
¶ 81. The decision of the Harrison County Circuit Court should be affirmed. For these reasons, I respectfully dissent.
BRIDGES, PAYNE and THOMAS, JJ., join this separate written opinion.
NOTES
[1] Count two was severed before commencement of trial, and James proceeded to trial on count one only.