912 So.2d 982 (2004)
Dayon JAMES a/k/a Dayon Hasan James, Sr. a/k/a Dayon Hasan-Nevada James, Appellant
v.
STATE of Mississippi, Appellee.
No. 96-KA-01058-COA.
Court of Appeals of Mississippi.
September 7, 2004.
Rehearing Denied November 23, 2004.
*984 Joseph P. Hudson and James Donald Evans, Gulfport, attorneys for appellant.
Office of the Attorney General by Billy L. Gore, attorney for appellee.
Before KING, C.J., LEE, P.J., and IRVING, J.
IRVING, J., for the Court.
¶ 1. Dayon James a/k/a Dayon Hasan James, Sr. was indicted by the grand jury of the First Judicial District of Harrison County for two counts of capital murder while in the commission of felonious child abuse. He was tried and convicted of count one by a jury and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Following the verdict, James moved for a new trial on the basis of jury impropriety in the consideration of extraneous information and for a judgment notwithstanding the verdict. The motions were denied, and James appealed his conviction.
¶ 2. This Court, in a modified opinion on motion for rehearing, James v. State, 777 So.2d 682 (Miss.Ct.App.2000), found that there was no reversible error in the conduct of the trial but held that the trial court should have conducted a hearing to determine whether the jury was exposed to extraneous information regarding the second count of the indictment. The case was remanded to the trial court for the purpose of holding such a hearing. The trial court was directed to hold an on-the-record polling hearing within ninety days or as soon thereafter as feasible to determine if extraneous matter was discussed during jury deliberations. Id. at (¶ 71). The trial court was not authorized nor directed to question jurors about their deliberations beyond that permitted by the Mississippi Rules of Evidence Rule 606(b); the poll was simply for the purpose of determining whether extraneous matter was discussed or mentioned. Id. If the court concluded from the poll that the jury did in fact discuss the extraneous matter of the death of the second child during the jury's deliberations, the court was instructed to, on its own and without further interrogation of the jury, determine the extent of the discussion and evaluate the impact, if any, that the discussion had on the jury's verdict, being guided by the teachings of Gladney v. Clarksdale Beverage Co., 625 So.2d 407 (Miss.1993). Id.
¶ 3. If the court determined that the jury's verdict was influenced by this information, notwithstanding the other evidence which the jury may have concluded pointed to James's guilt, it was instructed to grant James a new trial. Id. On the other hand, if the court determined that no extraneous matter was discussed or that the discussion of such matter did not influence the jury's verdict, it was instructed to certify its findings in this regard, along with a copy of the transcript of the hearing to this Court. Id.
*985 ¶ 4. In keeping with the order of this Court, a hearing was conducted. Of the twelve jurors and two alternates who sat on the jury, eleven jurors and one alternate appeared in response to the trial court's summons. One juror could not be located and one alternate failed to appear after being served with process. All of the jurors were questioned individually, outside the presence of the other jurors and all were asked the same basic questions by the trial court. Of the twelve jurors who appeared, six recalled receiving no information at any time about James other than the evidence produced in court. One juror testified that several weeks after she served on the jury, she heard something about another child being involved and went to the library where she attempted, without success, to find out if that was the case.
¶ 5. Another juror testified that she heard something about another child after the verdicts had been rendered on both the guilt and penalty phases of the trial. A third juror testified as follows: "Someone in the jury room did mention something; I don't recall what. But it was an incidental comment. It was as if they had noticed something on a bulletin board here in the courthouse or something, but I don't really recall." This juror could provide no other details about the comment.
¶ 6. The court posed the following question to each of the jurors at the hearing: "At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon James had been accused of killing another child other than the victim Shanekqua Keyes?" Juror Daniel Fazzio's response and a series of follow-up questions and answers were as follows:
A. Yes, sir.
Q. All right, sir. What information did you receive?
A. Just what was said in court.
Q. What was said in court?
A. Yes, sir, that they mentioned it.
Q. All right, sir. Now, do you remember whether that was mentioned by  in open court during the Court proceedings?
A. I don't remember, sir. It was too long ago.
Q. I understand. Do you remember the individual or the source of the information?
A. No, sir.
Q. What was it that you heard, or do you have any particular recollection as to what you heard concerning that?
A. That there was a possibility of another incident.
* * *
Q. Did you communicate that information to anybody else during the trial?
A. No, sir.
Q. Including any other jurors.
A. No, sir.
¶ 7. The whole notion of whether the jury was exposed to extraneous information was spawned by statements made by Wanda Conway. Conway had been a member of James's original venire panel but was not chosen to sit on James's trial jury. At the hearing on James's post trial motion Conway testified to the following:
She was a member of the prospective jury panel at James's trial. During voir dire the jury was instructed to refrain from discussing matters related to the trial. During the lunch break, she had lunch with three other members of the prospective jury, namely, Paula Dedeaux, Shawn Watson, and Juanita Hathorne. Questions regarding the nature of the trial came up and Paula Dedeaux *986 informed the rest of the group that James was on trial for murdering two children. One member of the group, Shawn Watson, was eventually selected and served on James's trial jury.
Conway testified that following the verdict she had a discussion with Shawn Watson regarding the jury deliberations. Conway's version of the conversation was as follows:
Yes. She said that they knew, some of the people in there knew about the second child and that they kept bringing it up. Said, well, you knowshe was saying that they was saying he was guilty because it was two children. She said she was one of the ones that kept saying we don't know if there were two children or not; we can only go on this child here. She said several of them, and she never mentioned any names or anything, she kept saying several of them knew. And she also mentioned thatbecause she asked me had I seen the docket sheet out front because some of them saw that he was charged with something else. I told her I hadn't seen the docket. She said the docket sheet said one of two, or first case, or something like that. She said she hadn't seen it either but they were discussing it.
¶ 8. Juror Shawn Watson testified at the hearing after remand that she was made aware that James had been accused of killing another child but said that her source for that information was "a paper outside the courtroom, and his name was listed two times." When asked if that was the only source of any information concerning James, she responded as follows: "I want to say some of the other jurors talked about it, his name being on that easel twice." She could not identify the other jurors and could give no other specifics concerning what may have been said except that another child was involved.
¶ 9. The court questioned Juror Martha Jordan as follows:
Q. Did you learn anything from the time you were selected to be on this jury and the time that you reached your verdict and was discharged from the case, did you learn from any other source any information about Mr. James other than what was here in this courtroom?
A. Well, there was some discussion one time about another child being involved.
Q. All right. And what was thatwhen was that discussion; do you remember?
A. Well, there are several witnesses testified that said "children"; they mention children.
Q. I see.
A. More than one child.
Q. And so you're saying that that was here in the courtroom; there were witnesses testifying to that?
A. Yes.
Q. Okay. Was there any discussion of that with anybody other than witnesses at this witness stand
A. No.
Q.  that you remember?
A. Well, we didin the jury room did mention this coming up with children?
Q. Okay.
A. But no one knew any details.
Q. Do you remember who may have been the jurors that were discussing it?
A. No, I don't remember who.
* * *
Q. At any time before you returned your verdict finding Dayon James guilty, were you informed or made aware from any source that Dayon *987 James had been accused of killing another child other than the victim Shanekqua Keyes?
A. No, not other than, you know, just seeing that there was children.
Q. I see. The reference to "children"?
A. Uh-huh (affirmative).
* * *
Q. Okay. Now, Ms. Jordan, the Clerk of the Court sometimes posts on a[sic] easel in the hallway outside the courtroom a copy of the Court's docket, the cases scheduled for hearing, so that witnesses and other interested parties can know which courtroom to go to. Did you see the docket that was posted out in the hallway?
A. Yes, I did.
Q. You did see it?
A. Yes, I did. And there was children on there.
Q. Did you read it?
A. I think so. We did.
Q. And so would that have been before the jury was selected, before you were actually seated?
A. Yes, it was.
Q. Do you remember what you read on that docket?
A. No. But I know there was children on there too. It wasn't just one child, there was children.
Q. I see. And that's all you can remember?
A. That's all I can remember.
¶ 10. In its findings, the lower court found that based on its own review of a copy of the docket sheet posted on the morning of James's trial (1) James's name appears on it only once, (2) there is neither any mention of multiple counts nor any direct mention that James faced any other charges, and (3) that the only information from which one might infer other charges against James is the notation, "Remarks: Judge Terry to hear/1st victim."
¶ 11. The lower court ruled that the juror's individual answers to the court's questioning, and their demeanor as they each testified, made it unreasonable to infer that the communication of which James complains altered the verdict in his case and the verdict should, therefore, not be impeached. James filed a motion for new trial which was denied. This appeal followed. James's allegations of error are as follows: (1) the polling procedure denied him due process and equal protection, (2) the failure to fully reconstitute the jury denied him due process, (3) the failure to grant his motion for a new trial was error, (4) the failure to sustain his objections to the jury polling procedure and the polling questions was error, (5) the failure to allow him to poll the jury was error, and (6) the court failed to sanction the State for improper contact with the jury.
¶ 12. Finding no reversible error, this Court affirms the decision of the circuit court.

ANALYSIS OF ISSUES PRESENTED

1. Due process and equal protection
¶ 13. James contends that the manner in which the trial court conducted the polling of the jury denied him equal protection of the law in violation of the United States Constitution and the Mississippi Constitution because the passage of more than four years from the time of his trial made it impractical to fully reconstitute the jury. He cites State v. Rideout, 143 N.H. 363, 725 A.2d 8 (1999).
¶ 14. In Rideout, the court found that the State had failed in its burden to show that no prejudice resulted from a juror's contact with a prosecution witness prior to the jury's deliberation and reversed and *988 remanded the case for a new trial because the passage of time made it impractical to fully reconstitute the jury.
¶ 15. We are not persuaded by Rideout for three reasons. Here, the burden was on James to show that some impropriety occurred since he is seeking to overturn the jury's verdict. Second, while the trial judge did not find that no communications occurred, he did find that, based on the jurors' answers and demeanor, it was unreasonable to infer that the communications altered the verdict. Thirdly, the trial jury in our case was substantially reconstituted, thereby providing great weight and credibility to any factual findings made as a result of the polling.
¶ 16. As to James's contention that the polling procedure denied him due process and equal protection, we direct James's attention to this Court's modified opinion on rehearing, James, 777 So.2d at (¶ 71), wherein the circuit court was instructed to follow the teachings of Gladney in conducting the jury polling. Gladney teaches that:
the proper procedure is for the judge to limit the questions asked the jurors to determine whether the communication was made and what it contained. Once it is determined that the communication was made and what the contents were, the court is then to decide whether it is reasonably possible this communication altered the verdict. We agree with the Supreme Court that "in the interests of protecting the jury system, and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors." We adopt the view held by the Ninth Circuit in Hard that inquiry is subject to the following limitation; the "Federal Rules of Evidence 606(b) prohibits juror testimony about the deliberative process or subjective effects of the extraneous information". See Hard, 812 F.2d at 485; Abatino v. United States, 750 F.2d 1442, 1446 (9th Cir.1985). We conclude that in the course of post-trial hearings, juror testimony is only admissible as to objective facts bearing on extraneous influences on the deliberation process.
Gladney, 625 So.2d 407, 419 (citations omitted).
¶ 17. Our review of the record reveals that the circuit court adhered to the dictates of Gladney, and this Court finds no basis for a finding of denial of due process or equal protection. This issue has no merit.

2. Failure to fully reconstitute the jury
¶ 18. James alleges that the failure to fully reconstitute the jury denied him due process and equal protection under the United States and Mississippi Constitutions. He asserts that in order for a polling to be valid, the entire jury must be reconstituted and their responses must be minimally consistent or unanimous. He contends that a missing juror is tantamount to a silent juror and because of the absent juror, the trial court could not eliminate all doubts as to the exposure of all jurors. He claims that the fact that one juror was not present during the polling process alone is sufficient to establish a denial of due process. He cites Fox v. United States, 417 F.2d 84 (5th Cir.1969).
¶ 19. The distinguishing feature between the case at bar and Fox is that the holding in Fox was in reference to the initial jury verdict on guilt. This Court's examination of the record provides ample evidence that the circuit court went out of its way to assemble the jury and to conduct the polling in strict adherence to this Court's instructions. Under the circumstances, we find that the absence of one juror does not invalidate an otherwise sound procedure.

*989 3. Denial of motion for new trial

¶ 20. James makes two allegations of error in the denial of his motion for a new trial. They will both be addressed in this section.
¶ 21. In his first allegation of error in the denial of his motion for new trial, James claims that he was entitled to a new trial because the jury poll results yielded conflicting responses. He contends that because the jury responses to the polling questions were not consistent, and that because no juror admitted introducing extraneous prejudicial information, those are indications that not all jurors were candid in their responses. He cites Hickson v. State, 707 So.2d 536 (Miss. 1997).
¶ 22. The trial court in Hickson was reversed and the case was remanded for a new trial on the ground that the defendant should have been granted a change of venue due to an enormous amount of pre-trial publicity that denied him a fair trial. The court held that the "Jones County community was exposed to pre-trial media publicity that was of such a character and content that Hickson could not have received a fair and impartial trial, evidenced in part by the improper question posed by a juror during jury deliberations about another charge against Hickson. Thus, we reverse and remand this matter for a new trial." Id. at 544(¶ 35).
¶ 23. This case is distinguishable. Hickson involved a change of venue issue. Here, the issue is whether extraneous materials or evidence was considered by the jury. A defendant is entitled to a change of venue when it is clear he cannot receive a fair trial in a particular venue because of pretrial publicity. Clearly, a discussion sua sponte by jurors during jury deliberations of other charges, which the jurors have learned, from pretrial publicity, are pending against a defendant, is some evidence that a change of venue may have been warranted. On the other hand when the issue is not pretrial publicity that implicates the need for a change of venue, but consideration of whether extraneous materials were considered during jury deliberations, the varying testimony of one or more jurors, pursuant to specific polling by the court about what they recalled, does not prove that extraneous materials were considered during jury deliberations or that what was discussed can be said to have reasonably affected the verdict. That is especially true when, as is the case here, based on the jurors' testimony, the more likely source of the alleged extraneous material was nothing more than the daily docket sheet.
¶ 24. While it is true that a juror who saw the docket sheet could reasonably inferfrom the notation on the docket sheet, "Judge Terry to hear/ 1st victim"that James was charged with killing two persons, but, without some information concerning the circumstances of the death of the second victim, it is a stretch to say that the jury would necessarily have been influenced by this paucity of information. We note that no juror said that he or she discussed or heard being discussed that James was charged with killing a second child. There was testimony that one juror had heard something about a second incident, and another juror thought the docket sheet mentioned something about children. However, on remand, the trial judge inspected the docket sheet and verified that the word "children" was not included. On these facts, we find our case distinguishable from Hickson.
¶ 25. James's second allegation of error regarding the trial judge's refusal to grant his motion for a new trial is that he was unfairly prejudiced by the passage of time. He claims that he was denied the *990 opportunity to fully develop his contentions that the burden shifted to the State to prove that the jury's exposure to extraneous information was harmless. We do not fully understand this contention. Whether the burden shifted to the State is a question of law, not a question of fact. Perhaps James believes that, if he had been allowed to question the jurors in the manner he desired, he could have established that extraneous materials were considered, and following such establishment, it would have been the responsibility of the State to prove that what occurred was harmless. As we have already stated, Gladney does not permit such a procedure.
¶ 26. This Court's instructions upon remand of this cause to the circuit court did not specify in detail how the hearing was to be conducted. The circuit court, however, followed the mandate of this Court in so far as it went and did an admirable job of reassembling and polling the jury. We can find no error in its decision to deny the motion for new trial. This issue has no merit.

4. Objections to polling procedure and questions
¶ 27. James asserts that the trial court erred in overruling a number of objections he made to the jury polling procedure as well as the poll questions. As stated in issue 3, this Court's instructions upon remand did not specify in details how the hearing was to be conducted. The manner of the polling procedure was left to the discretion of the circuit court judge subject only to the dictates of Gladney. We find no abuse of discretion in the manner in which the polling was conducted. This issue has no merit.

5. Failure to allow James to poll the jury
¶ 28. James contends that the circuit court erred in denying him an opportunity to question prospective jurors and other non-juror witnesses involved in the discussion of extraneous prejudicial information. In this allegation of error, James, once again, complains about the manner in which the circuit court chose to exercise its discretion in following the mandate of this Court. We have found no abuse of discretion in that regard. This issue has no merit.

6. Failure to sanction the State
¶ 29. James contends that the State willfully violated the circuit court's order which directed both the defense and the State not to have any communication or contact with the trial jury panel or any member of the prospective jury panel. The incident James makes reference to occurred during the process of attempting to reassemble the trial jury members, some of whom had relocated outside the state. Seeking to avoid giving any advance notice to the jurors that they would be questioned about their service on the jury, the court had ordered both sides to avoid any contact with any of the jury members. An investigator for the State, in attempting to obtain an address and/or telephone number for one of the jurors, informed the father of the juror that his daughter was being sought in reference to James's trial. The father, in turn, passed this information on to his daughter. No other details were provided. James asserts that by calling the last known telephone number for the juror, the State knowingly disobeyed the circuit court's order and in so doing threw "the proverbial skunk into the jury polling process."
¶ 30. The circuit court listened to the arguments on this issue and concluded that sanctions were not warranted. We find no abuse of discretion with the decision of the circuit court on this issue.
*991 ¶ 31. And now having found no error with the manner in which this case was handled on remand, this Court affirms the circuit court's ruling in all respects.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THE FINDINGS OF THE CIRCUIT COURT OF HARRISON COUNTY ON THE ISSUE OF JURY EXPOSURE TO EXTRANEOUS INFORMATION IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, CHANDLER, GRIFFIS AND BARNES, JJ., CONCUR.